[No. E040946. Fourth Dist., Div. Two. Mar. 12, 2008.]

GABRIEL BRUNI et al., Plaintiffs and Respondents, v.
JAMES H. DIDION, SR., Defendant and Appellant.

[No. E041120. Fourth Dist., Div. Two. Mar. 12, 2008.]

JAMES ALVARADO et al., Plaintiffs and Respondents, v.
JAMES H. DIDION, SR., et al., Defendants and Appellants.

**COUNSEL**

Gemmill Thornton & Baldridge, Bruce M. Thornton, Carlos Yguico; Cooksey, Toolen, Gage, Duffy & Woog and Richard E. Buck for Defendants and Appellants.

Kasdan Simonds Riley & Vaughan and Barry C. Vaughan for Plaintiffs and Respondents.

**OPINION**

**RICHLI, J.**—Plaintiffs purchased single-family homes, which came with what they were told was "an added bonus" or "extra protection"—an express limited warranty. Actually, the warranty provided coverage, subject to sweeping exclusions, for the whole home for just one year, and for the electrical, plumbing, and mechanical systems for just two years; after that, the only coverage it provided was for "load-bearing elements," and then only if the damage to them made the home "unsafe, unsanitary, or otherwise unlivable." Some versions of the warranty purported to relieve the builder of any liability *except* under the warranty. Finally—and crucially—the warranty included arbitration provisions, purporting to require the purchaser to arbitrate disputes arising from or related to not only the warranty, but also the home, the sale of the home, and the arbitration provisions themselves.

When plaintiffs filed suit against the alleged builders, alleging construction defects, the builders moved to compel arbitration. The trial court denied the motions, because it found that "this agreement" was "unconscionable."

The builders appeal. They contend that:

1. Pursuant to the arbitration provisions, the question of whether the arbitration provisions are unconscionable must be decided by the arbitrator, not by the trial court.

2. Assuming the trial court was even allowed to consider whether the arbitration provisions are unconscionable, it had to consider them by themselves, not together with the overall warranty.

3. The arbitration provisions, when considered by themselves, are not unconscionable.

4. Even assuming some of the arbitration provisions are unconscionable, the trial court should have severed them and enforced the remaining arbitration provisions.

5. Even assuming the trial court could consider the overall warranty, the overall warranty is not unconscionable or otherwise unenforceable.

We will hold that because plaintiffs are claiming, under the general rubric of unconscionability, that they never knowingly agreed to the arbitration provisions, the trial court, and not the arbitrator, had to resolve the unconscionability claim. We will further hold that the arbitration provisions were unconscionable because they were contained in a contract of adhesion, and they violated plaintiffs' reasonable expectations.[1]

# I

## PROCEDURAL BACKGROUND

In May 2005, Gabriel and Josephine Bruni and other individuals filed a complaint against James H. Didion, Sr. (Didion). Plaintiffs alleged that in 2001, they or their predecessors in interest purchased from Didion a total of 17 homes that Didion had built in "Heritage," a development in Yucaipa. Plaintiffs later discovered that these homes were defective. The defects allegedly included "defective installation of windows, waterproofing, short roof underlayerment [and] excessive stucco cracking," which resulted in "water intrusion, water damage, and other . . . property damage." They asserted causes of action for breach of contract, breach of implied warranties, negligence, strict liability, and intentional and negligent misrepresentation.

Also in May 2005, James and Pamela Alvarado and other individuals filed a similar complaint against Howard Roberts Development Co. (HRD) and

---

[1] Our analysis is fundamentally consistent with the recent opinion of another panel of this court in *Baker v. Osborne Development Corp.* (2008) 159 Cal.App.4th 884 [71 Cal.Rptr.3d 854] (petn. for review pending, petn. filed Mar. 4, 2008). However, in light of the petition for review filed in that case, rather than rely on it and risk having the principal support for our opinion become uncitable (see Cal. Rules of Court, rules 8.1105(e)(1), 8.1115(a)), we choose to analyze the issues independently.

Didion (collectively defendants), alleging that Didion was HRD's joint venturer and alter ego. Plaintiffs alleged that in 2002 and 2003, they or their predecessors in interest purchased a total of 20 homes from defendants that defendants had built in "The Groves at Chapman Heights," a development in Yucaipa. Plaintiffs later discovered that these homes had various defects. They asserted causes of action for breach of contract, breach of implied warranties, negligence, strict liability, and intentional and negligent misrepresentation. In addition, they asserted statutory causes of action based on Business and Professions Code sections 7031 (unlicensed contractor), 17200 (unfair competition), and 17500 (false advertising) and Civil Code section 896 (building standards for new homes).

The same law firm represented both the Bruni plaintiffs and the Alvarado plaintiffs.

In March 2006, defendants filed motions to compel arbitration in both actions.[2] Plaintiffs opposed the motions on a number of grounds, including that the arbitration provisions were unconscionable.

In June 2006, the trial court denied the motions. It explained: "[T]he protections provided to the builder under this agreement far exceed those benefits provided to the home purchaser. Circumstances of the explanation and execution of this agreement dictate a finding that a minimum le[vel] of integrity in the process was not reached here. See the case of Graham v. Scissor-Tail, Incorporated, a 1981 case, at 28 Cal.3d 807 [171 Cal.Rptr. 604, 623 P.2d 165]. The results of this agreement are too one-sided not to be found unconscionable. See Pardee Construction Company v. Superior Court, a 2002 case, at 100 Cal.App.4th, 1081 [123 Cal.Rptr.2d 288].

"Furthermore, the circumstances of its execution indicate that it is a contract of adhesion. The Court finds that the arbitration agreements are both procedurally and substantively unconscionable. For the record, the Court's decision is not based upon whether or not the plaintiffs read the agreement or understood it."

Defendants' counsel asked the trial court to specify the provision or provisions that were substantively unconscionable, but it declined to do so.

Defendants filed notices of appeal in both actions. (See Code Civ. Proc., § 1294, subd. (a) [order denying a petition to compel arbitration is appealable]; *Mercury Ins. Group v. Superior Court* (1998) 19 Cal.4th 332, 349 [79

---

[2] The motion in the Bruni action was directed at 13 of the 25 plaintiffs, who owned eight of the 17 homes. The motions in the Alvarado action were directed at 30 of the 35 plaintiffs, who owned 17 of the 20 homes. All of the plaintiffs at whom the motions were directed had purchased their homes directly from HRD. Accordingly, no issue is presented with respect to whether the arbitration provisions were (or could be) binding on successors in interest.

Cal.Rptr.2d 308, 965 P.2d 1178].) We granted defendants' unopposed motion to consolidate the two appeals.

## II

## FACTUAL BACKGROUND

HRD, a home builder, provided a warranty program created and administered by Home Buyers Warranty Corporation (HBW), a Colorado corporation. To enroll a home in the warranty program, HRD sent HBW an enrollment fee and an application form, signed by both the home buyer and HRD. HBW then sent the home buyer a certificate of warranty coverage and a warranty booklet.

The provisions of the one-page application form were in approximately seven-point type. The form stated, "By signing below, you acknowledge that you have . . . read a sample copy of the Warranty Booklet and CONSENT TO THE TERMS OF THESE DOCUMENTS INCLUDING THE BINDING ARBITRATION PROVISION contained therein. You further understand that when the warranty is issued on your new home it is an Express Limited Warranty and that all claims and liabilities are limited to and by the terms and conditions of the Express Limited Warranty as stated in the . . . [b]ooklet."

The warranty booklet, entitled "2-10 Home Buyers Warranty" (the Warranty), was 30 pages long. Most of its provisions were in approximately 10-point type. The Warranty was a contract between HRD and the home buyer. HRD's liability under the Warranty was limited to "the original sales price of your Home . . . ." Some or all of HRD's potential liability was covered by risk retention insurance.

The Warranty provided three categories of coverage. First, under the "workmanship" coverage, the home was warranted for one year to "be free from defects in material and workmanship as defined in the Construction Quality Standards . . . ." The Construction Quality Standards took up 19 of the 30 pages of the Warranty. They specified performance standards for different aspects of the construction; however, in the course of doing so, they also set forth additional limitations and exclusions. For example, next to "Cracking of attached garage floor slab," they provided, "NO COVERAGE."

Second, under the "Systems" coverage, the home was warranted for two years to "be free from defects in the electrical, plumbing, and mechanical systems to the extent stated in the same Construction Quality Standards."

Finally, the home was warranted for 10 years "against a Structural Defect." "Structural Defect" was defined as "actual physical damage to the designated

load-bearing elements of the Home caused by failure of such load-bearing elements which affects their load-bearing functions to the extent that your Home becomes unsafe, unsanitary, or otherwise unlivable."

The Warranty excluded any coverage for "[d]amage to swimming pools . . . ; driveways; boundary walls, retaining walls, and bulkheads (except where boundary walls, retaining walls and bulkheads are necessary for the structural stability of the Home); fences; landscaping . . . ; sprinkler systems; patios, decks, stoops, steps and porches, outbuildings [and] detached carports . . . ." It also excluded any coverage for "[n]oncompliance with plans and specifications" or "violations of local or national building codes, ordinances or standards."

The 2001 and 2002 versions of the Warranty further provided: "THIS IS AN EXPRESS LIMITED WARRANTY. All other express or implied warranties, including any oral or written statements or representations made by your Builder or any other person, and any implied warranty of habitability, merchantability or fitness, are hereby disclaimed by your [B]uilder and are hereby waived by you. In addition, you are waiving the right to seek damages or other legal or equitable remedies from your Builder . . . under any other common law or statutory theory of liability, including but not limited to negligence or strict liability. Your only remedy in the event of a defect in or to your Home . . . is the coverage provided to you under this express limited warranty."

The 2003 version of the Warranty, however, provided: "The protection provided to you under this Warranty is not in limitation of, but is in addition to, any other rights provided to you under California law." (Boldface omitted.)[3]

Finally, the Warranty included the following arbitration provisions:

"ARBITRATION Any and all claims, disputes and controversies by or between the Homeowner [and] the Builder . . . arising from or related to this Warranty, to the subject Home, to any defect in or to the subject Home . . . , or the sale of the subject Home by the Builder, including[,] without limitation, any claim of breach of contract, negligent or intentional misrepresentation or nondisclosure in the inducement, execution or performance of any contract, including this arbitration agreement, and breach of any alleged duty of good faith and fair dealing, shall be submitted to arbitration by and

---

[3] This wording change was due to the enactment of Civil Code section 895 et seq. (Stats. 2002, ch. 722, § 3), which makes builders of individual dwelling units liable for violating specified building standards (Civ. Code, § 896) and which further provides that a contract between the builder and the homeowner cannot waive this liability (Civ. Code, § 901).

pursuant to the rules of Construction Arbitration Services, Inc. . . . [, or by such other arbitration service as HBW shall, in its sole discretion[,] select, and pursuant to the rules of that arbitration service . . . .][4]

"This arbitration agreement shall inure to the benefit of, and be enforceable by, the Builder's . . . agents . . . and any other person whom [*sic*] the homeowner contends is responsible for any defect in or to the subject Home . . . . The decision of the arbitrator shall be final and binding . . . .

"This arbitration agreement shall be deemed to be a self-executing arbitration agreement. Any disputes concerning the interpretation or the enforceability of this arbitration agreement, including[,] without limitation, its revocability or voidability for any cause, the scope of arbitrable issues, and any defense based upon waiver, estoppel or laches, shall be decided by the arbitrator. [¶] . . . [¶]

"The parties expressly agree that this Warranty and this arbitration agreement involve and concern interstate commerce and are governed by the provisions of the Federal Arbitration Act (9 U.S.C. § 1, et seq.) . . . , to the exclusion of any different or inconsistent state or local law, ordinance or judicial rule . . . .

"If any provision of this arbitration agreement shall be determined by the arbitrator or by any court to be unenforceable or to have been waived, the remaining provisions shall be deemed to be severable therefore and enforceable according to their terms."[5]

Construction Arbitration Services, Inc. (CAS), is the largest alternative dispute resolution service in the United States that specializes in residential construction disputes. It has a panel of approximately 1,200 professional arbitrators throughout the United States.

Under CAS rules, "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement. [¶] . . . The arbitrator shall have the power to determine the existence or validity of a contract of which the arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not, for that reason alone, render the arbitration clause invalid."

---

[4] The wording in brackets appeared in the 2001 version of the Warranty, which applied to the Bruni plaintiffs, but not in the 2002 or 2003 versions, which applied to the Alvarado plaintiffs.

[5] The 2001 version of the Warranty also provided, "No arbitration proceeding shall involve more than one single-family detached dwelling . . . ." Defendants, however, have indicated that they would not oppose consolidated arbitration proceedings.

When plaintiffs purchased their homes, they met with an HRD salesperson to sign the necessary documents. The salesperson provided a "brief overview" of the documents and told plaintiffs where to sign or initial.

The documents were preprinted and "voluminous." There was no negotiation. Plaintiffs understood that the documents were being presented to them on a "take it or leave it" basis. While some of them had purchased a home before, plaintiffs generally were not familiar with real estate documents or with "legalese."

Plaintiffs were not told to read the Warranty before signing. The signing process was "pretty quick," typically 30 to 45 minutes; there was not enough time to read the Warranty or any of the other documents. Usually, plaintiffs received a copy of the Warranty, along with the other documents, after they were finished signing. Some, however, claimed that they did not receive it until after they had moved in. A few did not receive it at all.

Some plaintiffs were told that the warranty was "a benefit," "an added bonus," "extra protection," or "a huge gift from the builder." Others were told that it "would cover any problems with the home." Plaintiffs were never told how the Warranty would affect their legal rights.

## III

## DISCUSSION

### A.   *Standard of Review.*

"The petitioner bears the burden of proving the existence of a valid arbitration agreement by the preponderance of the evidence, and a party opposing the petition bears the burden of proving by a preponderance of the evidence any fact necessary to its defense. [Citation.] In these summary proceedings, the trial court sits as a trier of fact, weighing all the affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion, to reach a final determination. [Citation.]" (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972 [64 Cal.Rptr.2d 843, 938 P.2d 903].)

" 'We will uphold the trial court's resolution of disputed facts if supported by substantial evidence. [Citation.] Where, however, there is no disputed extrinsic evidence considered by the trial court, we will review its arbitrability decision de novo.' [Citation.]" (*Giuliano v. Inland Empire Personnel, Inc.* (2007) 149 Cal.App.4th 1276, 1284 [58 Cal.Rptr.3d 5], quoting *Nyulassy v. Lockheed Martin Corp.* (2004) 120 Cal.App.4th 1267, 1277 [16 Cal.Rptr.3d

296].) "Whether an arbitration provision is unconscionable is ultimately a question of law. [Citations.]" (*Higgins v. Superior Court* (2006) 140 Cal.App.4th 1238, 1250 [45 Cal.Rptr.3d 293].)

In this case, there was no dispute as to the historical facts, only as to the legal conclusions to be drawn from those facts; however, in one instance, it was possible to draw conflicting inferences from the otherwise uncontradicted evidence. Some—but not all—of the plaintiffs filed declarations in opposition to the motions, stating that they did not read the purchase documents, that there was no negotiation, etc. One could infer that the nontestifying plaintiffs' experiences were similar; on the other hand, from their very failure to testify, one could infer that their experiences were different. In this one instance, then, we presume that the trial court drew the inference most favorable to plaintiffs. Otherwise, we will apply a de novo standard of review.

   B.   Prima Paint *and the Severability Doctrine.*

   ■  "[W]hen considering a motion to compel arbitration, the court must initially 'determine whether the parties agreed to arbitrate the dispute in question.' [Citation.] 'This determination involves two considerations: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement.' [Citation.]" (*Banks v. Mitsubishi Motors Credit of America, Inc.* (5th Cir. 2005) 435 F.3d 538, 540 [156 Fed.Appx. 710], quoting *Webb v. Investacorp, Inc.* (5th Cir. 1996) 89 F.3d 252, 258; see also Code Civ. Proc., § 1281.2; *id.*, subd. (b).)

   ■  Ordinarily, the court cannot consider any claim that the contract as a whole is invalid. Under *Prima Paint v. Flood & Conklin* (1967) 388 U.S. 395 [18 L.Ed.2d 1270, 87 S.Ct. 1801] (*Prima Paint*), when the Federal Arbitration Act (9 U.S.C. § 1 et seq.) (FAA) applies, "arbitration clauses as a matter of federal law are 'separable' from the contracts in which they are embedded . . . ." (*Prima Paint*, at p. 402, fn. omitted.) As a result, an arbitration clause may be enforceable regardless of whether the contract surrounding it is enforceable. (*Id.* at p. 404.)

   For example, in *Prima Paint* itself, the party resisting arbitration claimed that it had been fraudulently induced to enter the contract. (*Prima Paint, supra*, 388 U.S. at p. 398.) The court held that, if the party had been claiming "fraud in the inducement of the arbitration clause itself," a court would have to adjudicate that claim before it could compel arbitration. (*Id.* at pp. 403–404.) However, the party could be compelled to arbitrate a claim of "fraud in the inducement of the contract generally." (*Id.* at p. 404.)

   Recently, in *Buckeye Check Cashing, Inc. v. Cardegna* (2006) 546 U.S. 440 [163 L.Ed.2d 1038, 126 S.Ct. 1204] (*Buckeye*), the Supreme Court held that

*Prima Paint* applies to void as well as voidable contracts. (*Buckeye*, at pp. 446–447 [126 S.Ct. at pp. 1209–1210].) There, the parties resisting arbitration claimed that the contract was illegal because it was usurious and "violated various [state] lending and consumer-protection laws . . . ." (*Id.* at p. 443 [126 S.Ct. at p. 1207].)

The Supreme Court held that the FAA required the illegality claim to be submitted to the arbitrator: "Challenges to the validity of arbitration agreements . . . can be divided into two types. One type challenges specifically the validity of the agreement to arbitrate. [Citation.] The other challenges the contract as a whole . . . . Respondents' claim is of this second type." (*Buckeye*, *supra*, 546 U.S. at p. 444 [126 S.Ct. at p. 1208], fn. omitted.) Under *Prima Paint*, it concluded, "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." (*Buckeye*, at pp. 445–446 [126 S.Ct. at p. 1209].)

The court observed: "It is true . . . that the *Prima Paint* rule permits a court to enforce an arbitration agreement in a contract that the arbitrator later finds to be void. But it is equally true that [the opposite] approach permits a court to deny effect to an arbitration provision in a contract that the court later finds to be perfectly enforceable. *Prima Paint* resolved this conundrum—and resolved it in favor of the separate enforceability of arbitration provisions." (*Buckeye*, *supra*, 546 U.S. at pp. 448–449 [126 S.Ct. at p. 1210].)

■ A court, however, still must consider one type of challenge to the overall contract: a claim that the party resisting arbitration never actually agreed to be bound. (See *Buckeye*, *supra*, 546 U.S. at p. 444, fn. 1 [126 S.Ct. at p. 1208, fn. 1] [noting that "[o]ur opinion today . . . does not speak to" "the issue [of] whether any agreement between the alleged obligor and obligee was ever concluded"].) " '[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' [Citations.]" (*Howsam v. Dean Witter Reynolds, Inc.* (2002) 537 U.S. 79, 83 [154 L.Ed.2d 491, 123 S.Ct. 588], quoting *Steelworkers v. Warrior & Gulf Co.* (1960) 363 U.S. 574, 582 [4 L.Ed.2d 1409, 80 S.Ct. 1347].) "Where . . . a party's apparent assent to a written contract is *negated* . . . , there is simply no arbitration agreement to be enforced." (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 416 [58 Cal.Rptr.2d 875, 926 P.2d 1061].) "There would . . . be a severe problem of bootstrapping if a party to a contract could be forced to arbitrate the question whether he had been coerced or deceived into agreeing to arbitrate disputes arising under the contract." (*Matterhorn, Inc. v. NCR Corp.* (7th Cir. 1985) 763 F.2d 866, 869.)

For example, the court, not the arbitrator, must determine:

(1) A claim of fraud in the execution (*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at pp. 416–417; *Cancanon v. Smith Barney, Harris, Upham & Co.* (11th Cir. 1986) 805 F.2d 998, 1000; but see *R.M. Perez & Associates, Inc. v. Welch* (5th Cir. 1992) 960 F.2d 534, 538–539);

(2) A claim of forgery (*Opals on Ice Lingerie v. Body Lines Inc.* (2d Cir. 2003) 320 F.3d 362, 370; *Chastain v. Robinson-Humphrey Co., Inc.* (11th Cir. 1992) 957 F.2d 851, 855; *Rowe Enterprises v. International Systems* (Fla.Dist.Ct.App. 2006) 932 So.2d 537, 538–541);

(3) A claim that the individual who signed the contract was not authorized to bind the party resisting arbitration (*Fleetwood Enterprises, Inc. v. Gaskamp* (5th Cir. 2002) 280 F.3d 1069, 1074–1077; *Sphere Drake Ins. Ltd. v. All American Ins. Co.* (7th Cir. 2001) 256 F.3d 587, 589–592; *Sandvik AB v. Advent Intern. Corp.* (3d Cir. 2000) 220 F.3d 99, 105–107; *Chastain v. Robinson-Humphrey Co., Inc., supra,* 957 F.2d at p. 855; *Three Valleys Mun. Water Dist. v. E. F. Hutton* (9th Cir. 1991) 925 F.2d 1136, 1138–1142); and

(4) A claim that the party resisting arbitration not only did not sign the contract, but also is not bound as an assignee or successor in interest of one of the original parties (*Wheat, First Securities, Inc. v. Green* (11th Cir. 1993) 993 F.2d 814, 818–819; *I.S. Joseph Co., Inc. v. Michigan Sugar Co.* (8th Cir. 1986) 803 F.2d 396, 400).[6]

Courts appear to be split on whether *Prima Paint* requires arbitration of a claim that the party resisting arbitration lacked the mental capacity to contract. (Compare *Spahr v. Secco* (10th Cir. 2003) 330 F.3d 1266, 1273 [court must decide lack-of-capacity claim before compelling arbitration] with *Primerica Life Ins. Co. v. Brown* (5th Cir. 2002) 304 F.3d 469, 471–472 [party can be compelled to arbitrate lack-of-capacity claim].)

In this case, the trial court ruled that the contracts here were within the scope of the FAA. Plaintiffs do not challenge that finding. We note, however, that California has adopted the severability doctrine and made it applicable, as a matter of state law, even to contracts that do not fall under the FAA. (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 322–324 [197 Cal.Rptr. 581, 673 P.2d 251].)

---

[6] Significantly, arbitration *has* been required where *the party resisting arbitration* admittedly was an original party to the arbitration agreement, and it was arguing that *the party demanding arbitration* was not an assignee or a successor in interest. (*Apollo Computer, Inc. v. Berg* (1st Cir. 1989) 886 F.2d 469, 473–474.)

C. *Agreement to Arbitrate Issues of Arbitrability.*

Defendants contend that plaintiffs' unconscionability claim challenged the Warranty as a whole, and hence, under *Prima Paint*, the trial court should have compelled arbitration without even considering unconscionability. Plaintiffs respond that, at least for purposes of the motion to compel arbitration, their unconscionability claim was directed solely at the arbitration provisions.

Defendants, however, also contend that, even assuming plaintiffs *are* challenging only the arbitration provisions, the trial court *still* should have compelled arbitration. They note that, under the arbitration provisions here, it was up to the arbitrator to decide whether the arbitration provisions themselves were valid. They argue that such "[a]greements to arbitrate issues of arbitrability are enforceable."

■ Because the parties are the masters of their collective fate, they can agree to arbitrate almost any dispute—even a dispute over whether the underlying dispute is subject to arbitration. However, there is a presumption that they have *not* agreed to this. "The question whether the parties have submitted a particular dispute to arbitration, *i.e.,* the '*question of arbitrability,*' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.' [Citations.]" (*Howsam v. Dean Witter Reynolds, Inc.*, *supra*, 537 U.S. at p. 83, quoting *AT&T Technologies v. Communications Workers* (1986) 475 U.S. 643, 649 [89 L.Ed.2d 648, 106 S.Ct. 1415].)

Regrettably, "arbitrability" is an ambiguous term that can encompass multiple distinct concepts. (See *Howsam v. Dean Witter Reynolds, Inc.*, *supra*, 537 U.S. at p. 84.) It seems clear that the parties can agree to have "arbitrability"—in the sense of the *scope* of the arbitration provisions— decided by the arbitrator. For example, in *Dream Theater, Inc. v. Dream Theater* (2004) 124 Cal.App.4th 547 [21 Cal.Rptr.3d 322], there was no dispute that the parties had entered into a valid and binding arbitration agreement (see *id.* at p. 555); the parties resisting arbitration merely disputed the scope of that agreement. They argued that one of the other side's claims was not arbitrable because it arose under a different contract, which did not have an arbitration clause; they also argued that the other side had waived one of its claims. (*Id.* at p. 557.) The appellate court held that the parties had "clearly and unmistakably agreed that the arbitrator will decide the *scope* of the arbitration agreement." (*Id.* at p. 553, some italics omitted, capitalization omitted; see also *id.* at pp. 553–557; accord, *Rodriguez v. American Technologies, Inc.* (2006) 136 Cal.App.4th 1110, 1123 [39 Cal.Rptr.3d 437].)

Similarly, in *Qualcomm Inc. v. Nokia Corp.* (Fed.Cir. 2006) 466 F.3d 1366, there does not seem to have been any dispute that the parties had entered into

a valid and binding arbitration agreement. (See *id.* at p. 1368.) Rather, the parties resisting arbitration argued that the underlying dispute did not arise out of or relate to the particular contract that contained the arbitration clause. (*Id.* at p. 1373; see also *id.* at pp. 1368–1369.) The appellate court held that the arbitration agreement "clearly and unmistakably shows the parties' intent to delegate the issue of determining arbitrability to an arbitrator." (*Id.* at p. 1373; see also *Mercedes Homes, Inc. v. Rosario* (Fla.Dist.Ct.App. 2006) 920 So.2d 1254, 1256 [parties agreed that scope of arbitrable issues was to be decided by arbitrator].)

But can the parties agree to have "arbitrability"—in the sense of whether the arbitration clause is valid, binding, and enforceable—decided by the arbitrator? At first glance, this appears hopelessly circular: It presumes that the parties are bound by the arbitration clause, even though this is the very issue that has yet to be decided. However, the only way to avoid such circularity is to presume that the parties are *not* bound by the arbitration clause, even though it may yet be decided that they *are*.

Thus, an agreement to arbitrate the validity of an arbitration clause presents the same "conundrum" that was noted in *Buckeye, supra*, 546 U.S. at page 449 [126 S.Ct. at page 1210]. According to *Buckeye*, "*Prima Paint* resolved this conundrum—and resolved it in favor of the separate enforceability of arbitration provisions." (*Ibid.*) We therefore conclude that *Prima Paint*, and the cases following it, provide the solution to the conundrum here, as well.

Under these circumstances, a court must look to the *precise nature of the claim* that the party resisting arbitration is making. If it is claiming that it never agreed to the arbitration clause at all—e.g., if it is claiming forgery or fraud in the factum—then the court must consider that claim. On the other hand, if it is not denying that it agreed to the arbitration clause, but instead it is claiming some other defense to enforcement of the arbitration clause—e.g., illegality or fraud in the inducement—then the court must enforce the "arbitrability" portion of the arbitration clause by compelling the parties to submit that defense to arbitration. This approach is consistent with the Supreme Court's direction that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so. [Citations.]" (*First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 944 [131 L.Ed.2d 985, 115 S.Ct. 1920].)

Defendants rely on *Terminix Intern. v. Palmer Ranch Ltd. Partnership* (11th Cir. 2005) 432 F.3d 1327. There, Terminix sought to compel arbitration of its dispute with Palmer Ranch. Palmer Ranch argued that the applicable arbitration clauses were illegal and unenforceable because they purported to

limit its statutory rights and remedies, including its right to recover punitive damages, treble damages, attorney fees, and injunctive and declaratory relief. (*Id.* at p. 1329.)

The appellate court noted that the arbitration clause incorporated American Arbitration Association rules and that these rules "provide[d] that '[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.' [Citation.]" (*Terminix Intern. v. Palmer Ranch Ltd. Partnership*, *supra*, 432 F.3d at p. 1332.) Thus, the parties had "clearly and unmistakably agreed that the arbitrator should decide whether the arbitration clause is valid." (*Ibid.*) The court concluded: "Because the parties have agreed that the arbitrator should decide this ultimate question, there is no reason for us to decide the subsidiary, antecedent questions regarding the validity of the remedial restrictions that Palmer Ranch now challenges." (*Id.* at p. 1333.)

Significantly, in *Terminix Intern. v. Palmer Ranch Ltd. Partnership*, *supra*, 432 F.3d 1327, Palmer Ranch was *not* claiming that it had not knowingly agreed to the arbitration clause. Instead, it was asserting a claim of illegality, much like the one in *Buckeye.* Thus, *Terminix* is not inconsistent with our view that, if the parties have agreed to arbitrate issues regarding the validity of the arbitration clause, a party that is claiming illegality can be compelled to arbitrate that defense.

D. *Application to Plaintiffs' Unconscionability Claim.*

We now apply these general principles to plaintiffs' unconscionability claim.

1. *General unconscionability principles.*

■ "Unconscionability has both a procedural and a substantive element. [Citation.] Both elements must be present for a court to invalidate a contract or clause, although the degree to which each must exist may vary. [Citation.]

"The procedural element of unconscionability focuses on two factors: oppression and surprise. [Citation.] ' "Oppression" arises from an inequality of bargaining power which results in no real negotiation and "an absence of meaningful choice." ' [Citation.] ' "Surprise" involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms.' [Citation.]

"The substantive element of unconscionability focuses on the actual terms of the agreement and evaluates whether they create ' "overly harsh" ' or

' "one-sided" ' results as to ' "shock the conscience." ' [Citations.]" (*Aron v. U-Haul Co. of California* (2006) 143 Cal.App.4th 796, 808 [49 Cal.Rptr.3d 555], quoting *A & M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473, 487 [186 Cal.Rptr. 114] & *Kinney v. United HealthCare Services, Inc.* (1999) 70 Cal.App.4th 1322, 1330 [83 Cal.Rptr.2d 348].)

" 'The procedural element of an unconscionable contract generally takes the form of a contract of adhesion . . . .' " (*Discover Bank v. Superior Court* (2005) 36 Cal.4th 148, 160 [30 Cal.Rptr.3d 76, 113 P.3d 1100].) However, "[a]dhesion is not a prerequisite for unconscionability." (*Harper v. Ultimo* (2003) 113 Cal.App.4th 1402, 1409 [7 Cal.Rptr.3d 418].) A contract term may be held to be unconscionable even if the weaker party knowingly agreed to it. (E.g., *Mercuro v. Superior Court* (2002) 96 Cal.App.4th 167, 174–175 [116 Cal.Rptr.2d 671].)

### 2. *Contracts of adhesion.*

" 'The term [contract of adhesion] signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' [Citation.]" (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 113 [99 Cal.Rptr.2d 745, 6 P.3d 669], quoting *Neal v. State Farm Ins. Cos.* (1961) 188 Cal.App.2d 690, 694 [10 Cal.Rptr. 781].) Adhesion contracts "are, of course, a familiar part of the modern legal landscape . . . . They are also an inevitable fact of life for all citizens—businessman and consumer alike." (*Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 817–818 [171 Cal.Rptr. 604, 623 P.2d 165], fns. omitted.)

"Although contracts of adhesion are generally enforceable according to their terms, a provision contained in such a contract cannot be enforced if it does not fall within the reasonable expectations of the weaker or 'adhering' party. [Citations.]" (*Fischer v. First Internat. Bank* (2003) 109 Cal.App.4th 1433, 1446 [1 Cal.Rptr.3d 162].)

It is not entirely clear whether this principle is a subspecies of the doctrine of unconscionability or a separate doctrine. (See *Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 925 & fn. 9 [216 Cal.Rptr. 345, 702 P.2d 503]; *Graham v. Scissor-Tail, Inc., supra*, 28 Cal.3d at p. 820.) Some cases have invalidated adhesion contract terms as beyond the reasonable expectations of the weaker party without any discussion of whether the terms were unconscionable. (E.g., *Fischer v. First Internat. Bank, supra*, 109 Cal.App.4th at pp. 1444–1447 ["dragnet" clause in preprinted form trust deed].) Nevertheless, failure to pass the "reasonable expectations" test is generally treated as

the equivalent of substantive unconscionability. (See *Armendariz v. Foundation Health Psychcare Services, Inc., supra,* 24 Cal.4th at p. 113.)

### 3. *The arbitrability of unconscionability claims.*

■ As we discussed in part IIIB., *ante,* ordinarily, a court must decide whether there is a valid agreement to arbitrate between the parties. Hence, if the party resisting arbitration is claiming that the arbitration clause itself is unconscionable, a court must decide this claim. (*Discover Bank v. Superior Court, supra,* 36 Cal.4th at p. 171; *Higgins v. Superior Court, supra,* 140 Cal.App.4th at pp. 1247–1248; *Nagrampa v. MailCoups, Inc.* (9th Cir. 2006) 469 F.3d 1257, 1270–1277 [en banc]; see also *Doctor's Associates, Inc. v. Casarotto* (1996) 517 U.S. 681, 687 [134 L.Ed.2d 902, 116 S.Ct. 1652] ["generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening [the FAA]"].) However, provided the court concludes that the arbitration clause itself is not unconscionable, it must compel arbitration, leaving it up to the arbitrator to determine whether the contract as a whole is unconscionable. (*Nagrampa,* at pp. 1270–1277; *Jenkins v. First American Cash Advance of Georgia* (11th Cir. 2005) 400 F.3d 868, 877.)

The case before us is not ordinary, however, because the arbitration provisions here empower the arbitrator to determine arbitrability. Accordingly, as we discussed in part IIIC., *ante,* we must look to the precise nature of plaintiffs' claims.

We may assume, without deciding, that if plaintiffs were admitting that they knowingly agreed to the arbitration provisions, they could be required to arbitrate an unconscionability claim. For example, in *Stewart v. Paul, Hastings, Janofsky & Walker, LLP* (S.D.N.Y. 2002) 201 F.Supp.2d 291, it was "undisputed that [the] plaintiff, as a condition of commencing her former employment, [had] signed a broad arbitration agreement with defendant . . . ." (*Id.* at p. 292.) The plaintiff argued, however, that the arbitration clause was unconscionable "because arbitration before the AAA, the forum selected by the clause, would be 'an uneven playing field,' the plaintiff 'must foot half the bill,' the forum is biased, the plaintiff has less time to file a claim, the opportunities for discovery are more limited, and any recovery inevitably would be smaller." (*Ibid.*) The court held that "the issue of enforceability of the clause in the first instance is for the arbitrator, as the arbitration clause explicitly provides that the arbitrator has exclusive jurisdiction to resolve any dispute as to whether 'all or any part of this Agreement is void or voidable.' " (*Ibid.,* fn. omitted.)

■ Here, however, plaintiffs are claiming that they never knowingly agreed to the arbitration provisions. As in most, if not all, adhesion contract

cases, they deny ever reading them. The general rule " 'that one who signs an instrument may not avoid the impact of its terms on the ground that he failed to read the instrument before signing it' " applies only in the absence of " 'overreaching' " (*Stewart v. Preston Pipeline Inc.* (2005) 134 Cal.App.4th 1565, 1588 [36 Cal.Rptr.3d 901]) or " ' "imposition" ' " (*Jefferson v. Department of Youth Authority* (2002) 28 Cal.4th 299, 303 [121 Cal.Rptr.2d 391, 48 P.3d 423]). Thus, it does not apply to an adhesion contract. (*Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 710 [131 Cal.Rptr. 882, 552 P.2d 1178]; *Ramirez v. Superior Court* (1980) 103 Cal.App.3d 746, 754 [163 Cal.Rptr. 223]; *Bauer v. Jackson* (1971) 15 Cal.App.3d 358, 370 [93 Cal.Rptr. 43].) Indeed, failure to read the contract helps "establish actual surprise . . . ." (*Patterson v. ITT Consumer Financial Corp.* (1993) 14 Cal.App.4th 1659, 1666 [18 Cal.Rptr.2d 563].)

▮▮▮ Defendants argue that, under Evidence Code section 622, plaintiffs are bound by the recital in the one-page application form that they had "read a sample copy of the warranty booklet . . . ." Evidence Code section 622, however, does not bar an assertion of fraud or other grounds for rescission. (*Miller v. Criswell* (1942) 54 Cal.App.2d 524, 527–528 [129 P.2d 450] [dealing with Code Civ. Proc., former § 1962, statutory predecessor of Evid. Code, § 622].) This would be impermissible bootstrapping. For similar reasons, it should not apply to recitals in an adhesion contract. (See *City of Santa Cruz v. Pacific Gas & Electric Co.* (2000) 82 Cal.App.4th 1167, 1176–1177 [99 Cal.Rptr.2d 198] [Evid. Code, § 622 "is inapplicable in the procedural circumstances presented here. This is not a situation involving arm's length negotiations marked by the opportunity of both sides 'to accept, reject, or modify the terms of the agreement' "].)

Accordingly, whatever may be the case with respect to claims of unconscionability in general, here plaintiffs are asserting that they never actually agreed to the arbitration provisions. They cannot be required to arbitrate *anything*—not even arbitrability—until a court has made a threshold determination that they did, in fact, agree to arbitrate *something*. We therefore turn to whether the purported agreement to arbitrate the question of arbitrability was unconscionable.

### 4. The arbitration provisions were adhesive and violated plaintiffs' reasonable expectations.

#### a. Contract of adhesion.

▮▮▮ As noted in part IIID.3., *ante*, a contract of adhesion is a standardized contract drafted by the party with stronger bargaining power, such that the weaker party has no choice other than to accept it or reject it. However,

an adhesion finding may also be informed by considerations of procedural unconscionability. (E.g., *Gutierrez v. Autowest, Inc.* (2003) 114 Cal.App.4th 77, 89 [7 Cal.Rptr.3d 267] [arbitration clause in automobile lease was adhesive, in part because it "was particularly inconspicuous, printed in eight-point typeface on the opposite side of the signature page of the lease"].)

In *Pardee Construction Co. v. Superior Court* (2002) 100 Cal.App.4th 1081 [123 Cal.Rptr.2d 288], the court upheld a finding that a homebuilder's standard purchase and sale agreement, which included a provision for having disputes heard by a judicial referee, was a contract of adhesion. (*Id.* at pp. 1086–1087.) It explained: "[A]s potential buyers interested in [the builder's] entry-level homes, plaintiffs were unlikely to have significant economic bargaining power against [a] developer . . . . Moreover, since judicial reference provisions were contained in agreements for purchase of all homes in [the builder]'s large development, plaintiffs had little choice other than to sign those agreements as presented . . . . [T]he situation presented each buyer with 'a take-it-or-leave-it proposition'; and since each buyer was 'buying a house,' not 'a piece of sporting equipment' or some other 'regular type of product,' factors such as 'location,' 'view,' and 'set-back' made it 'a pretty unique purchase,' one that 'for most people' is 'the biggest purchase they will ever make in their life.' . . . '[A]s a practical matter,' [the builder]'s argument that plaintiffs 'can go elsewhere if they don't like it' flies 'in the face' of 'the uniqueness of a home.' " (*Id.* at p. 1087.)

By contrast, in *Woodside Homes of Cal., Inc. v. Superior Court* (2003) 107 Cal.App.4th 723 [132 Cal.Rptr.2d 35] (Fourth Dist., Div. Two), we distinguished *Pardee*, finding no evidence that a buyer could not have rejected the judicial reference provision and no evidence from which this could even have been inferred (e.g., that the homes were " 'entry level,' " or that "similarly priced housing stock in the region" was unavailable). (*Id.* at pp. 728–729.) We also noted that "the Buyers were necessarily 'made aware of the existence of [the judicial reference] provision' because they had to initial the paragraph separately. [Citation.]" (*Id.* at p. 729, quoting *Wheeler v. St. Joseph Hospital* (1976) 63 Cal.App.3d 345, 361 [133 Cal.Rptr. 775].) We concluded, "Even if we do assume an imbalance in bargaining power, and that [the builder], as the stronger party, presumably prepared the contracts with an eye to its own advantage, and even if we also assume that [the builder] would not have countenanced the striking of the judicial reference provisions, the Buyers have nevertheless only shown a low level of procedural unconscionability because . . . the elements of surprise or, a fortiori, misrepresentation [citation] were not present." (*Woodside Homes*, at p. 730.)

Similarly, in *Trend Homes, Inc. v. Superior Court* (2005) 131 Cal.App.4th 950 [32 Cal.Rptr.3d 411], the court also distinguished *Pardee*. It noted that

(1) the judicial reference provision was "clearly written, entirely capitalized, and easily understood"; (2) both parties had to separately initial the provision, suggesting not only that the buyers had actual notice of it, but also that they could have refused to agree to it; (3) there was no evidence that the builder would have refused to delete the provision; (4) "there was no evidence concerning the availability of similarly priced housing in the area"; (5) there was no evidence that the buyers "lacked the education, experience, or sophistication necessary to understand the contracts"; and (6) the buyers "did not state that they had insufficient time to read the provision, were pressured to sign it without reading it carefully, or were not afforded the opportunity to consult with anyone else, such as an attorney, before signing . . . ." (*Trend Homes*, at pp. 958–959.)

Here, the trial court found that the arbitration provisions were part of a contract of adhesion. Although we are not bound by this finding, we agree with it. The reality of the transaction was that plaintiffs had to accept the arbitration provisions if they wanted to buy a house. The arbitration provisions were part of a preprinted form contract, presented on a take-it-or-leave-it basis. Even assuming that plaintiffs could have negotiated over some terms of the purchase and sale agreement, such as the purchase price, it seems apparent that any attempt to negotiate over the terms of the Warranty would have been fruitless, particularly because it arose out of a three-way relationship between the home buyer; HRD; and HBW, the administrator, which provided it as a package deal.

In addition, there is a strong showing of surprise. The arbitration provisions take up roughly one full page in a 30-page booklet. The entire booklet is in single-spaced, 10-point type. The arbitration provisions are not distinguished from the rest of the booklet by either bolding or capitalization. The booklet, in turn, was buried in a "voluminous" stack of purchase and sale documents.

Most important, plaintiffs were never asked to sign or initial the booklet, much less the arbitration provisions; they were merely asked to sign the one-page application. Admittedly, the application did indicate—in capital letters—that the booklet contained binding arbitration provisions; however, it did not provide any information regarding their scope or effect. It also recited that the home buyer had read a sample booklet, even though plaintiffs were not actually given a sample booklet until after they had signed the whole stack of documents—sometimes not even until they had moved in. HRD's agents lessened any incentive plaintiffs might have had to read the booklet by describing the Warranty as a benefit or a bonus.

We recognize that there was no evidence regarding the availability of similarly priced housing in the area. Nevertheless, the most recent view is

that "the absence of reasonable market alternatives" has no bearing on whether a contract is adhesive. (*Morris v. Redwood Empire Bancorp* (2005) 128 Cal.App.4th 1305, 1320 [27 Cal.Rptr.3d 797]; see *id.* at pp. 1319–1320, fn. 6 ["[t]he current definition of adhesion used by our Supreme Court . . . does not include a requirement that there exist alternative sources of supply"].) Rather, this factor is relevant to the distinct question of whether the contract—adhesive or not—is "oppressive," for purposes of procedural unconscionability. (*Ibid.*)

Interestingly, in *Burch v. Dist. Ct.* (2002) 118 Nev. 438 [49 P.3d 647], the Nevada Supreme Court was dealing with a "2-10 Home Buyers Warranty" essentially identical to the one here and an essentially identical application form. The court held that the warranty was a contract of adhesion: "[T]he one-page 'application' and the [warranty] were pre-printed, standardized contract forms. The Burches, the weaker party, were not given an opportunity to negotiate the [warranty]'s terms with [the builder] or its insurer . . . ; they were required to 'take it or leave it.' Therefore, the [warranty] agreement between the Burches and [the builder] is an adhesion contract." (*Id.* at p. 442.)

We similarly conclude that the arbitration provisions were contained in a contract of adhesion.

#### b. *Reasonable expectations.*

We turn, then, to whether the arbitration provisions violated plaintiffs' reasonable expectations. In doing so, we are mindful that our consideration is limited to the arbitration provisions themselves. Accordingly, we do not consider the other provisions of the Warranty, except insofar as they may bear on the scope or effect of the arbitration provisions.

Defendants argue that the arbitration provisions were only to be expected, because "[r]esidential purchase agreements frequently include arbitration agreements or some form of alternative dispute resolution provision." Here, however, the arbitration provisions were not contained within the main purchase and sale agreement; instead, they were contained in what was labeled as a warranty. Thus, plaintiffs would reasonably expect that the arbitration provisions would apply only to disputes over the Warranty.

Instead, the actual scope of the arbitration provisions was unforeseeably broad. They purported to apply not only to disputes "arising from or related to this Warranty," but also to all disputes "arising from or related to . . . the subject Home, . . . any defect in or to the subject Home . . . , or the sale of the subject Home by the Builder . . . ." This would not have been within plaintiffs' reasonable expectations.

Moreover, at least in the 2001 and 2002 versions, the Warranty purported to relieve the builder of any liability, *except* under the Warranty. As a result, *any* claim against defendants became a claim "arising from or related to" the Warranty itself and hence a claim within the scope of the arbitration provisions. For example, in the Alvarado action, plaintiffs assert a cause of action against defendants for acting as unlicensed contractors. (Bus. & Prof. Code, § 7031, subd. (b).) The Warranty, however, provided, "[Y]ou are waiving the right to seek damages . . . from your Builder . . . under any other common law or statutory theory of liability . . . ." For this reason, this cause of action falls within the scope of the arbitration provisions.

Finally, the arbitration provisions also purported to apply to disputes over arbitrability. As the United States Supreme Court has noted, the question of who should decide arbitrability "is rather arcane. A party often might not focus upon that question or upon the significance of having arbitrators decide the scope of their own powers. [Citation.]" (*First Options of Chicago, Inc. v. Kaplan*, *supra*, 514 U.S. at p. 945.) Thus, this provision, too, was well beyond a layperson's reasonable expectations.

### 5. *Severability.*

Defendants point out that the arbitration provisions include a severance clause. They argue that, even if some part of the arbitration provisions is held to be unconscionable, the remainder should be severed and enforced.

As we just indicated, however, the problem is that the scope of the arbitration provisions exceeded plaintiffs' reasonable expectations. Plaintiffs reasonably would have expected them, at most, to apply to disputes arising under the Warranty. The Bruni plaintiffs did not assert any cause of action based on the Warranty. In the Alvarado action, just one of plaintiffs' nine causes of action was for breach of the Warranty; requiring this subset of plaintiffs to arbitrate this subset of issues would be letting the arbitration tail wag the litigation dog. (Indeed, we suspect that, if this cause of action were the only basis for compelling arbitration, the Alvarado plaintiffs would dismiss it immediately.) Under these circumstances, the trial court would have abused its discretion if it had compelled arbitration. (See Code Civ. Proc., § 1281.2, subd. (c).)

Accordingly, even assuming severance would be warranted, it would not result in reversal of the trial court's order.

## IV

## DISPOSITION

The order appealed from is affirmed. Plaintiffs shall recover costs on appeal against defendants.

McKinster, Acting P. J., and King, J., concurred.

On March 24, 2008, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied June 18, 2008, S162755. George, C. J., Werdegar, J., and Corrigan, J., did not participate therein.