Filed 8/16/16  Ashbury Heights Capital v. Factset Research Systems CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION ONE

| | |
|---|---|
| ASHBURY HEIGHTS CAPITAL, LLC, | A145806 |
| Plaintiff and Respondent, | |
| v. | (San Francisco City & County Super. Ct. No. CGC-14-542833) |
| FACTSET RESEARCH SYSTEMS INC., et al., | |
| Defendants and Appellants. | |

Defendants FactSet Research Systems Inc. (FactSet), Bede LLC, formerly known as Revere Data, LLC (Revere), and Doug Engmann appeal the trial court's order denying their motion to compel arbitration.  Defendants assert plaintiff Ashbury Heights Capital, LLC is obligated to arbitrate its claims because it executed a licensing agreement with Revere that included a broad arbitration clause.  But plaintiff's claims pertain only to defendants' conduct in the years after that contract was terminated.  Accordingly, we affirm.

## I.  BACKGROUND

Plaintiff Ashbury Heights Capital, LLC is an investment management and research company.  Its founders invented an investment analytics technique that enables financial institutions to assess the impact of micro- and macro-economic events on companies and industries.  Plaintiff claims its systems enable users to more accurately predict how stock prices will move, largely based on economic information and extrapolations from companies' network of customer-supplier relationships.

Revere, which was later renamed Bede LLC, was in the business of data mining and sales of related analytical products used in the financial services industry. Engmann was the cochairman of Revere, as well as a member. He was also Revere's majority owner and debt holder. In August 2013, FactSet acquired substantially all of Revere's assets and rights under its agreements. Similar to Revere, FactSet sells technology-based products and services in the field of investment management and research.

In August 2010, plaintiff and Revere executed a software licensing agreement (the 2010 Agreement) concerning plaintiff's intellectual property. Pursuant to the 2010 Agreement, Revere was to pay plaintiff $100,000 to develop a "Relationship Analysis Engine" (RAE). Revere was also to pay plaintiff a consulting fee, consisting of 20 percent of the gross receipts of the sale of Revere products incorporating the RAE or any data, products, or services directly derived from the RAE. For certain products, plaintiff's consulting fee was not to exceed $750,000. The agreement also contained an arbitration clause, stating: "Any dispute or controversy arising hereunder between or among the parties . . . shall be submitted to an arbitration forum of the American Arbitration Association (the 'AAA') and shall be settled by binding arbitration."

In January 2011, the parties executed an amendment to the 2010 Agreement. Among other things, the 2011 amendment eliminated the cap on plaintiff's consulting fees, and added a provision stating plaintiff had the right to examine Revere's books and records to confirm the accuracy of the consulting fee. Further, plaintiff was to offer Revere sales support—including responding to customer questions, providing feedback for marketing materials updates, and training Revere employees—at a fixed retainer rate of $9,000 per month. The other terms of the 2010 Agreement were to remain in full force.

On July 3, 2012, plaintiff sent Revere written notice it was terminating the 2010 Agreement "in order to renegotiate less subjective terms and to explore strategic alternatives." To minimize disruption to Revere and its existing customers, plaintiff granted Revere a six-month nonexclusive "Bridge License" for use with existing

2

customers.  The fee for the bridge license was to be $9,000 per month, along with 20 percent of the gross receipts of sales of plaintiff's products.

Following the termination of the 2010 Agreement, the parties discussed the possibility of a new licensing agreement.  There is a dispute as to whether a new agreement was ever reached.  According to plaintiff a new "2012 Agreement" was memorialized in a series of e-mails exchanged in September 2012.  Defendants assert Revere did not agree to a new contract and, in any event, the e-mails on which plaintiff relies do not reflect there was an agreement on terms critical to the parties' relationship moving forward.  For the purposes of this appeal, we need not and do not decide whether the purported 2012 agreement is valid or enforceable.

In November 2014, plaintiff filed the instant action.  In its first amended complaint (FAC), the operative pleading in this matter, plaintiff alleged Revere had concealed sales of and revenues from plaintiff's products so as to avoid paying plaintiff its 20 percent consulting fee.  Plaintiff further alleged Revere had shared plaintiff's confidential intellectual property with various hedge funds.  Allegedly, Revere's sales force was instructed to disclose to customers how "the backend of the . . . Analytics Engine worked during sales pitches. . . . Revere explained that the customers could design their own similar techniques if they purchased Revere's Relationship Data without buying [plaintiff's] Analytics Engine."  It was further alleged defendants continued to falsely report sales and misappropriate benefits from plaintiff's intellectual property after the parties executed the purported 2012 agreement, as well as after FactSet acquired Revere's assets.

The FAC asserts five causes of action:  (1) breach of contract, (2) fraud, (3) breach of confidence, (4) quantum meruit, and (5) promissory estoppel.  Each of the first four claims include the following disclaimer:  "For avoidance of any doubt, this claim only pertains to conduct post-dating the termination of the 2010 and 2011 Agreements."  The last claim for promissory estoppel also does not arise out of defendants' conduct in 2010 and 2011, as it pertains to the enforcement of the alleged 2012 agreement.

3

In February 2015, Revere and Engmann filed a petition to compel arbitration and stay the litigation. The petition was denied. In its tentative order, the court explained the arbitration provisions of the 2010 Agreement did not apply to the dispute: "Plaintiff's [FAC] seeks no damages or relief for events that occurred *during* the time period covered by the 2010 Agreement. Defendants argue that the arbitration clause nonetheless applies to the [FAC]. However, the 2010 Agreement's plain language does not support that construction. The arbitration clause applies to disputes 'arising hereunder' or other matters 'herein.' It does not apply to disputes arising in time periods *after* the Agreement was terminated. [¶] . . . [¶] By Defendants' logic, if parties ever entered any contract containing an arbitration clause, they would be perpetually bound to arbitrate any dispute they ever had, even though their future agreements did not provide for arbitration. That is not the law."

## II.  DISCUSSION

On appeal, defendants once again argue plaintiff should be compelled to arbitrate its claims because it is bound by the arbitration clause in the 2010 Agreement. As the trial court held, the fundamental problem with defendants' position is the 2010 Agreement was terminated, and plaintiff only seeks relief in connection with defendants' conduct after the contract's termination. Defendants' attempts to argue around this are unpersuasive and without merit.[1]

In cases such as this, where there is no conflicting extrinsic evidence, the question of whether an arbitration agreement applies to a controversy is a question of law, which we review de novo. (*Brookwood v. Bank of America* (1996) 45 Cal.App.4th 1667, 1670.) The Federal Arbitration Act (9 U.S.C. § 1 et seq.; FAA) "pre-empts state laws which 'require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.' " (*Volt Info. Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S. 468, 478.) However, since parties must consent to arbitration, courts apply state

---

[1] As we find the arbitration clause in the 2010 Agreement has no application here, we need not reach defendants' arguments that Engmann and FactSet are entitled to enforce that provision under principles of agency law and equitable estoppel.

contract law to determine whether a party has agreed to arbitrate, "while giving due regard to the federal policy favoring arbitration." (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236 (*Pinnacle*).) "The FAA obligates states to treat arbitration agreements the same as other types of contracts, and prohibits them from disfavoring or burdening arbitration agreements compared to other types of contracts." (*Turtle Ridge Media Group, Inc. v. Pacific Bell Directory* (2006) 140 Cal.App.4th 828, 832.)

Defendants first argue the 2010 Agreement's arbitration clause applies because the FAC puts at issue their performance on and conduct during that agreement. As defendants point out, the FAC alleges Revere engaged in unscrupulous conduct "[f]rom nearly the outset of the parties' relationship." But plaintiff's discussion of defendants' pretermination conduct is merely background. Plaintiff does not seek any relief in connection with this earlier conduct. To the contrary, the FAC expressly states plaintiff's first four claims "only pertain[] to conduct post-dating the termination of the 2010 . . . Agreement[]." And plaintiff's remaining claim for promissory estoppel merely pertains to the enforcement of the purported 2012 Agreement. Thus, plaintiff's claims do not arise out of the 2010 Agreement. Instead, they focus on defendants' conduct in the years after that agreement was terminated.

Defendants assert plaintiff's allegations of pretermination misconduct will be used to support their request for punitive damages. They further contend an assessment of plaintiff's claims for quantum meruit will necessarily require an assessment of the monies already received under the 2010 Agreement. Defendants are essentially arguing we should disregard plaintiff's express disclaimer that they will not be seeking relief in connection with defendants' conduct during the 2010 Agreement. We refuse to do so.

Next, defendants argue the arbitration clause in the 2010 Agreement is so broad it encompasses disputes unrelated to the agreement itself. We are not persuaded. The arbitration clause in the 2010 Agreement provides: "Any dispute or controversy arising hereunder between or among the parties hereto, or in respect of any other matter, cause or thing whatsoever not herein otherwise provided for, including but not limited to, claims

for breach of any contract . . . , claims for compensation or benefits . . . , and claims for violation of any . . . law . . . shall be submitted to . . . arbitration." Defendants seize on the contract's reference to "any other matter . . . not herein otherwise provided for." According to defendants, this "catch-all language" compels arbitration of any claims between plaintiff and Revere, even if they are not related to the 2010 Agreement. But there must be some discernible limit to the scope of the arbitration clause, and this language appears to refer merely to the types of claims that are subject to arbitration, e.g., claims for breach, compensation, and benefits. Moreover, defendants' argument wrongly presumes plaintiff's termination of the agreement in 2012 had no effect on the parties' rights or obligations. Defendants are essentially arguing plaintiff continued to be bound by the 2010 Agreement's terms, including the arbitration clause, after it terminated the contract. Under defendants' logic, the parties are perpetually bound to arbitrate any dispute, regardless of when that dispute arises, what it involves, or any future agreement the parties execute, so long as the dispute involves plaintiff and Revere. If we were to adopt defendants' interpretation, a slip-and-fall claim filed 20 years from now would be subject to arbitration, so long as it involved both plaintiff and Revere. The result is untenable and surely does not reflect the original intent of the parties.[2]

Defendants assert that, given the overlapping subject matter covered by the 2010 Agreement and the purported 2012 agreement, as well the parties' express intent to arbitrate disputes regarding all aspects of their business relationship, we should find the arbitration clause remained in effect. But if the parties had wanted to maintain their obligations to arbitrate, they could have drafted a new agreement with an arbitration clause. They declined to do so. Without such an agreement we cannot presume the parties consented to arbitration going forward, especially when the prior contract was terminated.

---

[2] Defendants dismiss such hypotheticals as "absurd," but decline to enunciate any limit to their interpretation of the arbitration clause.

6

Defendants contend the 2010 Agreement provided for the survival of the arbitration clause in the event the agreement was terminated. Specifically, they point to section 23 of the agreement, which states: "Survival. Wherever necessary to carry out the intent of the parties, certain provisions of this Agreement will survive the expiration or termination of this Agreement and continue in full force and effect." But the clause does not specify which provisions are to survive termination, and defendants have pointed to nothing suggesting the parties intended the arbitration clause to survive.

Defendants' contention that plaintiff "could not unilaterally terminate the arbitration provision" also misses the mark. Section 5 of the 2010 Agreement states the agreement's initial term was to commence on August 6, 2010, and continue for a period of 24 months. Section 5 also states the agreement is to automatically renew for an additional 12-month period unless *either* party provides a written notice of termination to the other at least 30 days prior to the expiration of the initial term. Pursuant to section 5, plaintiff provided Revere with written notice of termination on July 3, 2012, 34 days prior to the conclusion of the initial term. Defendants ignore section 5, and instead point to section 16, which states: "This Agreement may be amended from time to time with the mutual written consent of the parties hereto." Defendants contend the arbitration provision must have survived termination, and thus the only way to void it was through modification by mutual consent of the parties, which was lacking here. But as discussed above, it is entirely unclear how the arbitration provision survived termination. Moreover, defendants' strained reading of section 16 renders meaningless section 5's statement that a party may unilaterally terminate, as it essentially requires the parties to mutually consent to the termination of each and every provision of the agreement.

Defendants assert their later conduct and the 2010 Agreement must be considered together because the 2010 Agreement was the first in a series of interrelated agreements between the parties. According to defendants, the arbitration clause in the 2010 Agreement should be read into these other interrelated agreements. In support, they cite to *Mleynek v. Headquarters Companies* (1984) 165 Cal.App.3d 1133. But the facts of that case are markedly different from those presented here. In *Mleynek*, the parties

7

entered into a franchise agreement which required the franchisees to negotiate with the franchisor for lease of retail space. (*Id.* at p. 1134.)  The franchisor later brought an unlawful detainer action based on the franchisees' failure to pay rent. (*Id.* at p. 1135.)  On appeal, the court reversed an order denying the franchisees' motion to compel arbitration. (*Id.* at pp. 1136–1137.)  The court reasoned the franchise agreement and sublease were so interrelated that the arbitration clause in the former should be read into the latter. (*Id.* at p. 1136.)  The agreements referred to each other and the franchise agreement specifically required the franchisees to perform all lease obligations and specified the duration of the sublease. (*Ibid.*)  In contrast, in the instant action, plaintiff terminated the 2010 Agreement so it could negotiate a new, distinct contract with more favorable terms.  Moreover, there is no indication any subsequent agreements reached by the parties expressly referred to the 2010 Agreement or its terms.

Defendants assert public policy strongly favors the enforcement of the arbitration provision.  We cannot agree.  "[A]rbitration under the FAA 'is a matter of consent, not coercion.'  [Citation.]  Thus, ' "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." ' "  (*Pinnacle*, *supra*, 55 Cal.4th at p. 236.)  In this case, there is no indication plaintiff consented to arbitration of disputes concerning its continuing business relationship with Revere after the termination of the 2010 Agreement.  Indeed, there is not even a "reasonable doubt" that plaintiff's claims come within the agreement's arbitration clause.  (*Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 687.)  Thus, forcing plaintiff to arbitrate and denying it access to the courts would in fact fly in the face of public policy.

Next, defendants contend that disputes concerning the arbitrability of plaintiff's claims should be resolved by an arbitrator, not the courts.  We disagree.  "Because the parties are the masters of their collective fate, they can agree to arbitrate almost any dispute—even a dispute over whether the underlying dispute is subject to arbitration.  However, there is a presumption that they have *not* agreed to this.  'The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the *"question of arbitrability,"* is "an issue for judicial determination [u]nless the parties clearly and

8

unmistakably provide otherwise." [Citations.]' [Citations.] [¶] Regrettably, 'arbitrability' is an ambiguous term that can encompass multiple distinct concepts. [Citation.] It seems clear that the parties can agree to have 'arbitrability'—in the sense of the *scope* of the arbitration provisions—decided by the arbitrator." (*Bruni v. Didion* (2008) 160 Cal.App.4th 1272, 1286.) However, the parties may not agree to have the arbitrator determine whether they agreed to an arbitration clause or whether such a clause is valid or binding. (*Id.* at p. 1287.) A contrary rule would be "hopelessly circular: It presumes that the parties are bound by the arbitration clause, even though this is the very issue that has yet to be decided." (*Ibid.*)

Here, defendants assert the parties clearly and unmistakably agreed to submit issues of arbitrability to the arbitrator because the arbitration clause states all disputes "shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the AAA." Though defendants do not cite the specific AAA rules at issue, they do cite authority holding these rules specify the arbitrator will decide disputes over the scope of the arbitration agreement. But the dispute here turns on the continued validity of the arbitration clause, not the clause's scope. As discussed above, we conclude the arbitration clause was terminated along with the rest of the 2010 Agreement in July 2012, and plaintiff's claims arise out of defendants' conduct after the termination. As plaintiff did not consent to arbitrate claims concerning such conduct, the arbitrator lacks authority to both adjudicate plaintiff's claims and resolve disputes concerning the claims' arbitrability. To hold otherwise would mean binding plaintiff to arbitrate matters that it never agreed to arbitrate.

The other authority on which defendants rely is also inapposite. In *Buckhorn v. St. Jude Heritage Medical Group* (2004) 121 Cal.App.4th 1401, a discharged physician sued his former employers for wrongful termination. (*Id.* at p. 1403.) The physician also asserted claims for various torts allegedly committed after he was discharged, including defamation and interference with prospective economic advantage. (*Id.* at p. 1404.) The physician's employment agreement contained an arbitration clause. (*Ibid.*) On appeal, the physician argued his claims for defamation and tortious interference were not subject

9

to arbitration because they were based on events occurring after his termination. (*Id.* at p. 1407.) The court rejected the argument, stating this "temporal test misconstrues the applicable standard. The issue turns on whether the tort claims are 'rooted' in the contractual relationship between the parties, not when they occurred." (*Ibid.*) For example, the physician's claims for tortious interference were predicated on his expectation of future income from patients who had consulted him as an employee of the defendants, and thus the employment agreement "would inform the extent of any economic interest." (*Id.* at pp. 1407–1408.) In contrast, in the instant action, plaintiff's claims are not rooted in the parties' 2010 Agreement. Its claims expressly pertain only to defendant's alleged misconduct during the period after the contract was terminated and any subsequent agreement the parties may have reached.

Defendants' reliance on *Ajida Technologies, Inc. v. Roos Instruments, Inc.* (2001) 87 Cal.App.4th 534, is also misplaced. In that case, the parties executed an agreement to jointly develop and market a microwave measurement system for testing integrated circuits. (*Id.* at p. 538.) The agreement contained an arbitration clause. (*Ibid.*) After the parties' relationship broke down, they submitted the dispute to arbitration. (*Ibid.*) The arbitration award directed the defendants to pay damages and attorney fees, develop and market the microwave measurement device, and make royalty payments to the plaintiff. (*Ibid.*) The arbitrator also ruled the provisions in the agreement for arbitration would apply to any future disputes arising out of the award. (*Id.* at p. 539.) On appeal, the defendants challenged this final provision, arguing their contractual obligation to arbitrate expired with the termination of the agreement. (*Id.* at p. 544.) The court disagreed: "Assuming a broad interpretation of [the arbitration] clause, it is not irrational to extend its operation to controversies arising from the very award that interprets the agreement." (*Ibid.*) The court also held "a party's contractual duty to arbitrate disputes *may* survive termination of the agreement." (*Id.* at p. 545, italics added.) The court did not identify under what circumstances a duty to arbitrate would survive, other than those presented in

10

the case before it.[3]  As the instant action does not involve a dispute concerning an arbitration award, it is clearly distinguishable.

*Windsor Pacific LLC v. Samwood Co., Inc.* (2013) 213 Cal.App.4th 263 is also inapposite.  There, the plaintiff filed a quiet title action seeking a prescriptive easement over two roads.  (*Id.* at p. 269.)  The trial court held the plaintiff's use of the roads did not create a prescriptive easement because it was expressly authorized by an agreement granting the plaintiff a permissive easement.  (*Ibid.*)  The defendant moved for attorney fees based on a provision of the easement agreement.  (*Ibid.*)  The order denying the attorney fee motion was reversed on appeal.  (*Id.* at p. 266.)  As an initial matter, the court held the defendant was the prevailing party in an action to enforce or interpret the easement agreement.  (*Id.* at p. 273.)  The court also held the termination of the easement agreement did not negate its attorney fee clause.  (*Id.* at p. 276.)  While the parties had agreed their respective performance obligations would be terminated upon the termination of the agreement, the agreement's provisions concerning subsidiary matters related to dispute resolution remained in effect.  (*Id.* at p. 277.)  Thus, the attorney fee provision survived for the purpose of resolving disputes concerning the easement

---

[3] In support of its general holding concerning the survival of a party's contractual duty to arbitrate, the court cited to several cases involving terminated agreements.  (*Ajida Technologies, Inc. v. Roos Instruments, Inc.*, *supra*, 87 Cal.App.4th at pp. 545–546.)  Those cases are also distinguishable.  For example, in *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, the court merely held an arbitrator did not exceed his authority in resolving the parties' dispute over the allocation of attorney fees following termination of employment since the dispute arose out of the employment contract.  (*Id.* at p. 28.)  In *Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, the plaintiff hospital terminated its contracting service agreement with the defendant health care services provider just *two days* before it filed its action for unfair competition and unfair trade practices.  (*Id.* at p. 681.)  The court rejected the plaintiff's argument that its dispute with the defendant arose during this two-day period as "ludicrous."  (*Id.* at p. 685.)

agreement.  (*Ibid.*)  Unlike *Windsor Pacific*, the instant action does not arise out of a dispute over the agreement containing the arbitration clause.[4]

## III.  DISPOSITION

The trial court's order denying the motion to compel arbitration is affirmed. Plaintiff shall recover its costs on appeal.


_____
Margulies, J.


We concur:


_____
Humes, P.J.


_____
Dondero, J.


---

[4] In their reply brief, defendants also cite to our recent decision in *Jenks v. DLA Piper Rudnick Gray Cary US LLP* (2015) 243 Cal.App.4th 1.  This case is inapposite as well.  We merely held an employment offer letter, which contained an arbitration provision, was not superseded by an employment termination agreement, which did not contain such a provision.  (*Id.* at pp. 15–20.)