Filed 1/24/23  Herlitz v. Capital Senior Living CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| BETTY HERLITZ, | C097245 |
| Plaintiff and Respondent, | (Super. Ct. No. 34-2021-00310867-CU-BC-GDS) |
| v. | |
| CAPITAL SENIOR LIVING, INC., | |
| Defendant and Appellant; | |
| PACIFICA SENIOR LIVING MANAGEMENT, LLC, | |
| Defendant and Respondent. | |

Plaintiff Betty Herlitz brought an elder abuse action against defendants Capital Senior Living, Inc. (Capital) and Pacifica Senior Living Management, LLC (collectively defendants), both of which are involved in the operation of The Crest at Citrus Heights (Crest), an independent senior living facility where plaintiff lived.  After plaintiff filed

her action, defendants filed a petition to compel binding arbitration and stay proceedings. The trial court denied the petition, finding the arbitration agreement between plaintiff and defendants was unconscionable and severance was infeasible because the unconscionability permeated the arbitration agreement. Capital appeals; we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

"Plaintiff's claims arise from the allegedly neglectful care she received while a resident at Crest. Before [p]laintiff moved into Crest, [p]laintiff's son . . . met with an executive director at Crest who represented that Crest employees would check on residents at least twice per day. [Citation.] However, on March 31, 2021, [p]laintiff, who had a history of falls and ambulated with a walker, fell while making lunch in her residence. [Citation.] Plaintiff was not able to get up and was left lying on the floor until she was finally discovered on April 2, 2021. [Citation.] No one from Crest checked on [p]laintiff during this time."

Following the filing of plaintiff's complaint, defendants filed a petition to compel arbitration and stay proceedings. As it pertains to the arbitration agreement between the parties, the following facts were revealed through the petitioning process: "On May 26, 2020, [p]laintiff's son met with Crest's executive director Dawn Kraft and signed the admission packet as a responsible party of a resident. [Citation.] The following day, [p]laintiff also met with Ms. Kraft and signed the packet. [Citation.] The admission packet included the subject arbitration agreement, which both [p]laintiff and [her son] signed separately from the rest of the packet. [Citation.] According to Ms. Kraft, she explained the arbitration provision to [p]laintiff before [p]laintiff signed, and [p]laintiff

---

[1]     While Capital disputes the admissibility of plaintiff's son's declaration, the parties do not dispute the accuracy of the trial court's recitation of the evidence submitted to it. Thus, we adopt the trial court's recitation of facts, with minor additions supplied by the record.

verbally acknowledged the provision. [Citation.]  According to [p]laintiff's son, Ms. [Kraft] did not explain the arbitration provision or any other aspect of the admission packet to him or to [p]laintiff, and [p]laintiff has no knowledge of the arbitration provision.[2]  [Citation.]

"[T]he arbitration agreement is included as part of the admission packet . . . .  The entire packet totals approximately 55 pages, which includes the 25-page residence and service agreement, 10 attachments labeled A[ through ]J, a five-page signature section, an addendum that operates as an amendment, and a payment authorization form.  The arbitration agreement is included as Attachment I, which totals five pages and is found at approximately pages 42[ through ]46 of the admission packet.  The arbitration agreement is also referenced in the residence and service agreement at page 22 of 25, under paragraph H, and is titled in bold, capitalized font, '**BINDING ARBITRATION AGREEMENT**.'  [Citation.]  The paragraph then states, 'All disputes arising out of or relating *in any way* to this Agreement or to any of the Resident's stay at the Community SHALL BE RESOLVED BY BINDING ARBITRATION AND NOT BY A JUDGE OR JURY as more fully detailed in **Attachment I** (Binding Arbitration Agreement), except as set forth therein.'  [Citation.]  All of the other paragraph titles in the residence and service agreement are also typed in all caps and bold font that is the same size as the title for paragraph H, and the font type and size of the paragraph itself is no different than any other paragraph.  In addition to the signatures for the entire admission packet and the arbitration agreement, [p]laintiff and her son signed the amendment and the payment authorization form, and [plaintiff's son] also signed Attachment G, which is titled '**RESPONSIBLE PARTY AGREEMENT**.'  [Citation.]

---

**2**     Plaintiff relied exclusively on the declaration of her son, while Capital relied exclusively on the declaration of Kraft.

3

"The relevant terms of the arbitration agreement are as follows.  The first page includes the agreement to arbitrate, which reads as follows:

'1.     **BINDING AGREEMENT TO ARBITRATE**.  Except as provided below, the Parties agree that any action, dispute, claim, or controversy of any kind, whether in contract or in tort, statutory or common law, legal or equitable or otherwise, arising out of the provision of goods, services, or items provided under the terms of this or any other agreement between the Parties, or any other dispute involving acts or omissions that cause damage or injury to either Party shall be resolved exclusively by binding arbitration ("the '**Arbitration**' ["]) in accordance with the [Federal Arbitration Act] (defined below) and not by lawsuit or the judicial process.  To the fullest extent permitted by law, this Section shall apply to third parties who are not signatories to this Arbitration Agreement, including any spouse, heirs, or persons claiming through the Resident.  Any claims or grievances against the Community's direct or indirect corporate parent, subsidiaries, affiliates, employees, officers, or directors shall also be subject to and resolved by arbitration in accordance with this Section.'

"[Citation.]

"Thus, the arbitration agreement is broad in scope in that it applies to 'any action, dispute, claim, or controversy of any kind' arising out of the residence and service agreement, but this breadth is qualified by the opening phrase, 'Except as provided below, . . . .'  The exceptions are listed in the following paragraph, which states[,] 'The parties agree that the following matters are expressly excluded from the Arbitration Agreement and shall be litigated in court, unless the parties expressly agree otherwise in writing after a dispute has arisen:  (a) matters involving eviction, (b) matters relating to Monthly Rental payments and related fees, (c) matters falling below the jurisdictional limit of small claims court, . . . .' [Citation.]  The agreement also exempts two other types of claims not applicable to California residents and thus not relevant here.

4

"The arbitration agreement is governed by the [Federal Arbitration Act]. [Citation.] The arbitration proceedings may be conducted by an agreed upon arbitration association or individual arbitrator, and shall be governed by the Federal Rules of Evidence and Procedure. [Citation.] Further, with respect to attorney's fees and costs, 'The Parties shall bear their own attorneys' fees and costs and hereby expressly waive any right to recover attorney fees or costs, actual or statutory, unless otherwise provided by law.' [Citation.] The arbitrator's fees are split 50-50 between plaintiff(s) and defendant(s). [Citation.]

"Two additional important clauses are contained on the third and fourth pages of the arbitration agreement, which constitute the last two pages of the terms of the agreement, since the fifth page serves as a signature page. The first clause emphasizes the waiver of a jury trial, and states, '9. **WAIVER OF CONSTITUTIONAL RIGHTS. THE PARTIES UNDERSTAND AND AGREE THAT BY ENTERING INTO THIS ARBITRATION AGREEMENT THEY ARE GIVING UP AND WAIVING THEIR CONSTITUTIONAL RIGHT TO HAVE ANY CLAIM OR DISPUTE DECIDED IN A COURT OF LAW OR EQUITY BEFORE A JUDGE AND/OR JURY**.' [Citation.] The next clause is found at paragraph 12, the second to last paragraph of the terms of the agreement, and states, '12. **LIMITATION OF COMMUNITY'S LIABILITY**. If the Resident alleges that the Community harmed the Resident in some way, the Resident is entitled to seek recovery against the Community in Arbitration for the Resident's out-of-pocket costs actually incurred, plus up to $100,000 for other forms of damages (such as compensatory, consequential, incidental or punitive) suffered by the Resident. **THE RESIDENT ACKNOWLEDGES AND AGREES THAT WITH REGARD TO ANY DISPUTE OR CLAIM WHETHER IN BINDING ARBITRATION OR OTHERWISE, THE RESIDENT HEREBY WAIVES ANY CLAIM OR AWARD AGAINST THE COMMUNITY, ITS OWNERS, PARENTS, SUBSIDIARIES, AFFILIATES, DIRECTORS, OFFICERS, MANAGERS,**

**AGENTS, SUCCESSORS OR ASSIGNEES, FOR ANY AMOUNT OF DAMAGES (INCLUDING WITHOUT LIMITATION, COMPENSATORY, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES) TO WHICH THE RESIDENT, ITS AGENT OR RESPONSIBLE PARTY, HEIRS, EXECUTORS OR ADMINISTRATORS MAY OTHERWISE BE ENTITLED OR WHICH MAY BE AWARDED, OTHER THAN (A) ACTUAL MEDICAL OUT-OF-POCKET COSTS ACTUALLY INCURRED PLUS (B) AN AMOUNT NOT TO EXCEED $100,000.00.  THIS SECTION IS SUBJECT TO ANY AGREEMENT BY THE RESIDENT TO RELEASE THE COMMUNITY FROM ANY AND ALL LIABILITY.  THIS SECTION 13 SHALL BE VOID IF EXPRESSLY PROHIBITED BY STATE LAW.**' [Citation.]

"Finally, the arbitration agreement includes a severability clause that allows any term found to be invalid to be severed from the rest of the agreement to thus maintain the enforceability of the remainder of the agreement."

The trial court denied defendants' petition to compel arbitration, finding the agreement between the parties was procedurally and substantively unconscionable.  The trial court also found the arbitration agreement was permeated by unconscionability, and thus the entire agreement was unenforceable and no portion could be severed.  In doing so, the trial court refused to consider defendants' evidentiary objections to the admission of plaintiff's son's declaration because the objection was not timely raised.

Capital appeals.[3]

---

[3]     Pacifica Senior Living Management, LLC is designated as a respondent in this appeal.  It did not file briefing or otherwise participate in the appellate process.

DISCUSSION

I

*Capital Forfeited Its Argument The Arbitration Agreement Required*

*An Arbitrator To Decide Issues Of Arbitrability And Unconscionability*

Capital contends a provision in the arbitration agreement requires issues of arbitrability and unconscionability to be decided by the arbitrator and not a trial court. Consequently, Capital argues, it was error for the trial court to decide these threshold issues, and the matter should be remanded with direction to arbitrate the issues. Capital failed to raise this issue in the trial court and instead asserted that it had an enforceable arbitration agreement that was not unconscionable. Indeed, at no point did Capital rely on paragraph 3 of the arbitration agreement, which purports to delegate issues of arbitrability to an arbitrator, to prevail on its petition to compel arbitration. As a result, this issue is forfeited. " ' " '[I]t is fundamental that a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court.' Thus, 'we ignore arguments, authority, and facts not presented and litigated in the trial court. Generally, issues raised for the first time on appeal which were not litigated in the trial court are [forfeited]. [Citations.]' " [Citation.] "Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider." ' " (*Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 564.)

Still, in its reply brief Capital raises an exception to the forfeiture rule, in that the arbitrability of threshold issues is a question of law and dispositive to the case, i.e., important. We disagree. Appellate courts have relaxed the forfeiture rule and have permitted a party to raise belatedly " 'a pure question of law which is presented on undisputed facts' " when " 'important issues of public policy are at issue.' " (*Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 417; accord *In re S.B.*

7

(2004) 32 Cal.4th 1287, 1293 ["appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue"], superseded by statute on other grounds as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962.) Capital has failed to proffer a compelling public policy reason for us to reach the issue of arbitrability it forfeited by failing to assert it in the trial court. Because of Capital's failure to assert a claim it argues is dispositive, the trial court already addressed the issue it wants an arbitrator to address. Absent a compelling public policy reason to do so, we decline to exercise our discretion to decide this forfeited claim.

II

*The Trial Court Did Not Abuse Its Discretion By Refusing*

*To Consider Capital's Belatedly Filed Evidentiary Objections*

Capital argues the trial court abused its discretion by failing to consider its objections to plaintiff's son's declaration. We disagree.

A

*Background*

"During its oral argument, [d]efendant Capital made reference to its objections to the Declaration of [plaintiff's son]. However, the [trial c]ourt pointed out that no such objections were timely filed or otherwise appear[ed] in the register of actions. In response to [d]efendant Capital's request, the [trial c]ourt ordered that by no later than September 21, 2022, [d]efendant Capital m[ight] submit a filing, attaching as an exhibit, a file-endorsed copy of said objections indicating that it was timely filed and served on [p]laintiff. If no such filing [was] made, the [trial c]ourt w[ould] rely upon the register of actions as accurate. The matter w[ould] be deemed submitted on September 21, 2022. Plaintiff indicated that it had no objection to this procedure for purposes of addressing whether [d]efendant Capital's objections were timely filed and served and whether they m[ight] thereby be considered by the [trial c]ourt."

8

"In response to the [trial c]ourt's directive, [d]efendant Capital instead filed a declaration and supplemental briefing confirming that [d]efendant Capital did <u>not</u> file any objections in a timely manner, or at all, in advance of the hearing.  [Citation.]  Defendant Capital submit[ted] additional unsolicited argument that its unfiled objections should nonetheless be allowed to be filed . . . and considered on the merits in the [trial c]ourt's decision on this matter which [was] already under submission.  The [trial c]ourt decline[d] to do so.  Briefing ha[d] been closed on this matter.  The [trial c]ourt ha[d] already issued its tentative ruling.  The [trial c]ourt ha[d] also considered oral argument. The [trial c]ourt's prior order was only to allow submission of proof that [d]efendant Capital's objections were in fact filed despite their absence in the Register of Actions. They were not.  At this point, [d]efendant Capital's proposed evidentiary objections [were] significantly untimely and the [trial c]ourt decline[d] to allow such late filing and consideration.  In any event, for purposes of the record on appeal, the [trial c]ourt note[d] that had [d]efendant Capital's proposed Objections to the Declaration of [plaintiff's son] [citation] been timely filed, they would not have altered the [trial c]ourt's decision. Defendant Capital's proposed objections, which principally assert[ed] lack of personal knowledge, hearsay and irrelevance, would have been overruled."

The additional argument the trial court referred to in its order was Capital's contention that it believed its objections had been lodged with the trial court because it had delivered them to a filing service for filing and had also served plaintiff with the objections.  The filing service, however, inadvertently failed to file the objections on Capital's behalf.

B

*There Was No Abuse Of Discretion*

"We review the trial court's rulings regarding the admissibility of the evidence for an abuse of discretion."  (*People v. Mataele* (2022) 13 Cal.5th 372, 413-414.)  Under this standard, "[a] trial court's decision to admit or exclude evidence ' " 'will not be disturbed

9

unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice.' " ' [Citations.] 'This standard of review affords considerable deference to the trial court provided that the court acted in accordance with the governing rules of law. We presume that the court properly applied the law and acted within its discretion unless the appellant affirmatively shows otherwise.' " (*Ibid*.)

Capital contends the trial court abused its discretion by not considering Capital's untimely objections to plaintiff's son's declaration because the untimeliness of the objections was inadvertent, the objections were served on plaintiff, and Capital took corrective action as soon as it realized the filing service failed to file the objections. It argues the error was prejudicial because the trial court's denial of its petition to compel arbitration relied heavily on plaintiff's son's inadmissible establishment of key facts.

Capital filed its reply brief on September 8, 2022, and attempted to file its objections at that time by providing them to their filing service. The hearing on the petition to compel arbitration occurred a week later, on September 15, 2022. Capital provides no reason for why it did not discover its filing service's failure to file the objections before the hearing, at which time the trial court had already researched the issues raised and had drafted a tentative ruling. While the late filing may have occurred through inadvertence, Capital was the only party (including the court) that had any control over the filing of the objections. Capital delegated the filing to a third party and did not check on it or otherwise ensure its objections were filed with the court until an adverse ruling had been presented to the parties. Given the stage of the proceedings when Capital attempted to remedy its failure to timely file its evidentiary objections, the trial court was within its discretion to refuse to consider the late filed objections.

In any event, the trial court did not consider plaintiff's son's declaration to establish facts outside his personal knowledge or facts that contradicted Kraft's declaration as Capital argues. The trial court considered plaintiff's son's declaration to

10

establish that plaintiff signed the arbitration agreement while she was outside of her son's presence and that the arbitration agreement, at least to plaintiff's son, was an adhesion contract in the sense that he felt he had to sign the agreement or plaintiff would not have been permitted to live at Crest. These were facts within plaintiff's son's personal knowledge and relevant to the process Capital employed when eliciting agreement from plaintiff and her designated responsible party. For this reason, Capital cannot demonstrate it was prejudiced by the trial court's refusal to consider its evidentiary objections to plaintiff's son's declaration because it cannot demonstrate a more favorable outcome was reasonably probable had the evidentiary objections been considered. (See Cal. Const., art. VI, § 13 ["No judgment shall be set aside . . . in any cause . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice"]; *People v. Watson* (1956) 46 Cal.2d 818, 836 ["a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"].)

## III

### *The Arbitration Agreement Was Unconscionable*

Capital contends the trial court erred by determining the arbitration agreement was procedurally and substantively unconscionable. We disagree.

### A

### *Applicable Law*

" ' "If the court's order is based on a decision of fact, then we adopt a substantial evidence standard. [Citations.] Alternatively, if the court's denial rests solely on a decision of law, then a de novo standard of review is employed." ' " (*Chambers v. Crown Asset Management, LLC* (2021) 71 Cal.App.5th 583, 591.) "Where . . . the

11

evidence is not in conflict, we review the trial court's denial of arbitration de novo." (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236.) Whether the trial court erred in declining to sever portions of the arbitration provision is reviewed for abuse of discretion. (*Carmona v. Lincoln Millennium Car Wash, Inc*. (2014) 226 Cal.App.4th 74, 83.)

"We use general principles of California contract law to determine the enforceability of [an] arbitration agreement." (*Mission Viejo Emergency Medical Associates v. Beta Healthcare Group* (2011) 197 Cal.App.4th 1146, 1153.) " 'The party seeking to compel arbitration bears the burden of proving the existence of an arbitration agreement, while the party opposing the petition bears the burden of establishing a defense to the agreement's enforcement.' " (*Sandoval-Ryan v. Oleander Holdings LLC* (2020) 58 Cal.App.5th 217, 222.) "[A]greements to arbitrate [may] be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.' " (*AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333, 339.)

Plaintiff does not contest that an agreement to arbitrate existed and argues instead the agreement was unconscionable. " '[U]nconscionability has both a "procedural" and a "substantive" element,' the former focusing on ' "oppression" ' or ' "surprise" ' due to unequal bargaining power, the latter on ' "overly harsh" ' or ' "one-sided" ' results. [Citation.] 'The prevailing view is that [procedural and substantive unconscionability] must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability.' [Citation.] But they need not be present in the same degree. 'Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves.' [Citations.] In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the

conclusion that the term is unenforceable, and vice versa." (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114, italics omitted (*Armendariz*).)

B

*Procedural Unconscionability*

"[T]he initial question regarding procedural unconscionability is whether the contract was one of adhesion, namely, a ' "standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." ' " (*Dougherty v. Roseville Heritage Partners* (2020) 47 Cal.App.5th 93, 103.) " 'Procedural unconscionability' concerns the manner in which the contract was negotiated and the circumstances of the parties at that time. [Citation.] It focuses on factors of oppression and surprise. [Citation.] The oppression component arises from an inequality of bargaining power of the parties to the contract and an absence of real negotiation or a meaningful choice on the part of the weaker party." (*Kinney v. United HealthCare Services, Inc.* (1999) 70 Cal.App.4th 1322, 1329.) "The second component of procedural unconscionability encompasses an aspect of surprise, with the terms to which the party supposedly agreed being hidden in a prolix printed form drafted by the party seeking to enforce them." (*Ibid.*)

Like the trial court, we conclude there was a high degree of procedural unconscionability because of the adhesive nature of the agreement, the unequal bargaining power of the parties, and the agreement's placement within the larger admission packet. Capital disagrees with these conclusions.[4]

---

[4] Capital spends a significant portion of its opening brief arguing that plaintiff's son's declaration fails to establish Capital did not explain the arbitration agreement to plaintiff or that she lacked capacity to read and understand it herself. We agree, as did the trial court. Indeed, the trial court did not find that plaintiff lacked capacity or that Kraft failed to explain the arbitration agreement to plaintiff. The trial court found that

As to the adhesive nature of the arbitration agreement, Capital argues plaintiff failed to submit evidence demonstrating she was prohibited from negotiating the terms of the contract. While plaintiff did not submit a declaration describing her own understanding of her ability to negotiate terms of the agreement, the circumstances of the signing indicate negotiation was discouraged and likely infeasible. While Kraft discussed the arbitration agreement with plaintiff, the agreement was presented as part of a 55-page admission packet providing the terms of and rules applicable to plaintiff's residency at Crest. This included a statement at the beginning of the residence and service agreement providing: "**You are encouraged to consult with trusted family members and friends, health care providers and/or legal counsel about whether signing this Agreement and becoming a resident and remaining a resident at the Community is appropriate for You.**" The admission packet then contained the 25-page residence and service agreement of terms and conditions related to plaintiff's living space, common areas, fees and rent, services provided and not provided by Crest, and termination of the agreement. The admission packet also contained 30 pages of attachments, which included multiple Crest policies, as well as the arbitration agreement and payment authorization.

The way the arbitration agreement was presented to plaintiff discouraged negotiation. It was contained in a large and preprinted admission packet that communicated a wide variety of subjects and *requirements* of residency. In the midst of going through these voluminous requirements, prospective tenants can hardly be expected to negotiate regarding terms presented as Crest's established practices and conditions of residency. This is especially true given the initial bolded paragraph informing prospective residents that if they disagreed with the contents of the admission

---

regardless of plaintiff's capacity and opportunity to read the arbitration agreement, however, the agreement was procedurally unconscionable given the other circumstances of its formation. We agree with this conclusion.

14

packet, Crest was not a good fit for them, i.e., they should find other living accommodations.

Further, and contrary to Capital's assertions, the agreement's terms did not communicate that the arbitration "agreement was purely voluntary and not a precondition to [plaintiff]'s residency at the Crest." The provisions cited by Capital tell plaintiff only that she must voluntarily enter the agreement and can ask any questions or consult with an attorney "before choosing to sign and accept the terms and conditions of th[e] arbitration agreement." (Capitalization omitted.) Indeed, similar language is included in the residence and service agreement as attesting to plaintiff's capacity to sign, and not plaintiff's ability to voluntarily pick and choose the terms with which she must comply. Ultimately, the language attesting to the voluntariness of the arbitration agreement does not communicate to plaintiff that she may reside at Crest without signing an arbitration agreement or that she can negotiate the terms of the agreement. Consequently, upon a reasonable reading of the admission packet, plaintiff was presented with a "take it or leave it" decision indicative of a contract of adhesion. (See *Armendariz*, *supra*, 24 Cal.4th at p. 113 [a contract adhesion is a " 'standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it' "]; *Gentry v. Superior Court* (2007) 42 Cal.4th 443, 469 ["Ordinary contracts of adhesion, although they are indispensable facts of modern life that are generally enforced [citation], contain a degree of procedural unconscionability even without any notable surprises, and 'bear within them the clear danger of oppression and overreaching' "].)

Moreover, "an inference of voluntary assent can be indulged only so far and must yield in the face of undisputed facts that undermine it." (*OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 129.) Here, plaintiff has demonstrated such facts pertaining to the unequal bargaining power between the parties. Capital argues plaintiff has not established she lacked capacity to understand the agreement and negotiate changes if she had wanted to

15

do so. Capital points to the fact that plaintiff's son does not hold a durable power of attorney for plaintiff and plaintiff brought this suit on her own behalf to show plaintiff was capable of knowing, understanding, and negotiating the agreement.

We are not persuaded. Kraft knew that plaintiff's son was assisting her in finding a home that met her changing mobility needs. Kraft secured plaintiff's son's consent to the arbitration agreement and other contract provisions as a "responsible party" and then presented the same signature page her son signed to plaintiff for her signature. Plaintiff is in her eighties, has mobility concerns, and was trying to find a new home to better fit her changing lifestyle. The incentive she had to independently understand and negotiate (or opt out of) the arbitration agreement was diminished by Kraft's presentation of plaintiff's son's consent to plaintiff when asking for plaintiff's consent to the arbitration agreement. In essence, Kraft informed plaintiff her son had already reviewed the admission packet, including the arbitration agreement, and agreed to the terms, and thus encouraged plaintiff to agree based on her son's assent. The fact the arbitration agreement was never explained or pointed out to plaintiff's son before his signature supports the inference that Capital induced plaintiff's agreement without ensuring she, or the person from whom she sought guidance, understood the agreement.

As to surprise, Capital points to Kraft's declaration, in which she declared she explained the arbitration agreement to plaintiff and that plaintiff verbally acknowledged the agreement before signing it. Capital further points to the arbitration agreement's utilization of bolded and capitalized font to inform plaintiff of key terms. Like the trial court, we find these facts are outweighed by the placement of the arbitration agreement and the key provisions within it. The arbitration agreement was first referred to on page 22 of 25 of the residence and service agreement. The reference was a sentence with some capitalized words informing plaintiff of the agreement's existence at the end of the contract. The arbitration agreement was located on page 42 of 55 of the admission packet and consisted of three and one-half pages of text. The only bolded and capitalized

16

provisions of the arbitration agreement appear on page three and the top of page four. The placement of the arbitration agreement and its key provisions at the end of a voluminous amount of text served to hide the agreement and minimize its importance. Thus, while the agreement included bolded and capitalized text, it was presented in a way such that those safeguards were likely to be unnoticed. (See *Bruni v. Didion* (2008) 160 Cal.App.4th 1272, 1288 [" ' " 'Surprise' involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms" ' "].) Moreover, surprise is not a necessary element of procedural unconscionability in the presence of an adhesion contract. (*Baltazar v. Forever 21, Inc.* (2016) 62 Cal.4th 1237, 1244.)

In sum, Capital points to several circumstances of the contract as not being procedurally unconscionable, but several elements of procedural unconscionability outweigh Capital's contentions. The form of the contract discouraged negotiation and obscured key terms among voluminous text. Further, presenting the contract to plaintiff to sign after her "responsible party" son signed the contract gave plaintiff a sense of security that the contract was fair and encouraged her to agree with or rely on her son's execution of the contract without independently assessing the contract's reasonableness for herself. These factors demonstrate a high degree of procedural unconscionability, warranting a review of the arbitration provision for substantive unconscionability. Where there is "substantial procedural unconscionability . . . , even a relatively low degree of substantive unconscionability may suffice to render the agreement unenforceable." (*OTO, L.L.C. v. Kho*, *supra*, 8 Cal.5th at p. 130.)

C

*Substantive Unconscionability*

"The substantive element of the unconscionability analysis 'looks to the actual terms of the parties' agreement to "ensure[] that contracts, particularly contracts of adhesion, do not impose terms that have been variously described as ' " 'overly harsh' " '

17

[citation], ' "unduly oppressive" ' [citation], ' "so one-sided as to 'shock the conscience' " ' [citation], or 'unfairly one-sided.' " [Citation.] These formulations "all mean the same thing." [Citation.] Substantive unconscionability " 'is concerned not with "a simple old-fashioned bad bargain" [citation], but with terms that are "unreasonably favorable to the more powerful party." ' " [Citation.] "The substantive component of unconscionability looks to whether the contract allocates the risks of the bargain in an objectively unreasonable or unexpected manner." [Citation.] While private arbitration may resolve disputes faster and cheaper than judicial proceedings, it " 'may also become an instrument of injustice imposed on a "take it or leave it" basis.' " [Citation.] " 'The courts must distinguish the former from the latter, to ensure that private arbitration systems resolve disputes not only with speed and economy but also with fairness.' " ' " (*Bakersfield College v. California Community College Athletic Assn.* (2019) 41 Cal.App.5th 753, 765.)

Here, the trial court found a high degree of substantive unconscionability based on three provisions in the arbitration agreement. The trial court addressed the first two provisions in tandem, which were the fee limiting and liability limiting provisions. The fee limiting provision required plaintiff to pay her own attorney fees and costs, while the liability limiting provision limited recovery to plaintiff for her actual medical out-of-pocket costs plus $100,000 and required plaintiff to waive actual or statutory damages. Capital argues these provisions were not substantively unconscionable, despite the provisions' violation of public policy (*Bickel v. Sunrise Assisted Living* (2012) 206 Cal.App.4th 1, 12-13 [waiver in residency agreement of the plaintiff's statutory remedies under the Elder Abuse Act unenforceable as contrary to public policy]), because both provisions included carve out clauses making the provisions void if they violate state law. We, however, determine whether a contract provision was " ' "unconscionable at the time it was made." ' " (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1134.) Although the contractual terms included a general carve out when invalid under

18

state law, the provisions put the burden on plaintiff to allege and prove that fact. Under these circumstances, the arbitration provisions that violate public policy qualify as an overly harsh or one-sided result. (See *Armendariz*, *supra*, 24 Cal.4th at pp. 110-111.)

For the same reasons, we reject Capital's assertion the attorney fees and costs provision was not unconscionable because its language was reciprocal and complied with the American system of requiring parties to bear their own attorney fees and costs. In the area of elder abuse, however, the Legislature has determined these claims to be an exception to the American form of reciprocal attorney fees and costs. (*Bickel v. Sunrise Assisted Living*, *supra*, 206 Cal.App.4th at pp. 12-13.) The fact that the demographic of victims of elder abuse are the same demographic at the center of all Capital's contracts involving Crest indicates Capital's intention to subvert public policy in this area. Accordingly, these provisions are substantively unconscionable.

The third provision the trial court found substantively unconscionable was the term limiting the arbitrable claims to those most likely to be brought by plaintiff, while the claims Capital would most likely raise were permitted to be brought in court. Capital argues this determination was error because the law only prohibits treating parties differently, not treating types of claims differently. We disagree with Capital's broad interpretation. In *Armendariz,* our Supreme Court explained mutuality as follows: "[It] is not to say that an arbitration clause must mandate the arbitration of all claims between employer and employee in order to avoid invalidation on grounds of unconscionability. Indeed, as the employer points out, the present arbitration agreement does not require arbitration of all conceivable claims that an employee might have against an employer, only wrongful termination claims. But an arbitration agreement imposed in an adhesive context lacks basic fairness and mutuality if it requires one contracting party, but not the other, to arbitrate all claims arising out of the same transaction or occurrence or series of transactions or occurrences. The arbitration agreement in this case lacks mutuality in this sense because it requires the arbitration of employee--but not employer--claims arising

19

out of a wrongful termination.  An employee terminated for stealing trade secrets, for example, must arbitrate his or her wrongful termination claim under the agreement while the employer has no corresponding obligation to arbitrate its trade secrets claim against the employee." (*Armendariz*, *supra*, 24 Cal.4th at p. 120.)

Here, the agreement exempted from arbitration "matters involving eviction" and "matters relating to Monthly Rental payments and related fees," as well as claims falling below the jurisdictional limit of small claims court.  The trial court found that Capital would be the party most likely to bring claims involving eviction and the payment of rent and fees.  We agree with this assessment and reject Capital's assertions to the contrary.  The basis of the relationship between plaintiff and Capital is that plaintiff pays Capital rent and fees for living accommodations and services, and Capital has the power to evict plaintiff for failing to pay those rents and fees or for any violation of the residence and service agreement.  But plaintiff does not have the right to bring a court action for breach of contract for Capital's failure to provide services pursuant to the residence and service agreement until it is the basis of her withholding rent or being evicted.  On this level, the provision lacks mutuality in that it does not permit both parties to bring a court proceeding for "all claims arising out of the same transaction or occurrence or series of transactions or occurrences." (*Armendariz*, *supra*, 24 Cal.4th at p. 120.)  In its reply brief, Capital argues statutory provisions exist to allow plaintiff to sue under circumstances pertaining to the uninhabitability of her living space before it rises to the degree of her withholding rent payments or monthly fees.  Again, however, the arbitration agreement does not explicitly provide for this exception and instead places the burden on plaintiff to raise and prove that her claim falls within the statutory exception not articulated in the arbitration agreement.

" '[T]he paramount consideration in assessing [substantive] [un]conscionability is mutuality.' " (*Nyulassy v. Lockheed Martin Corp.* (2004) 120 Cal.App.4th 1267, 1281.)  An arbitration agreement requires a " 'modicum of bilaterality,' " meaning the drafter

cannot require another to submit a claim to arbitration but not accept the same limitation when it would act as the plaintiff "without at least some reasonable justification for such one-sidedness based on 'business realities.' " (*Armendariz*, *supra*, 24 Cal.4th at p. 117.) "When only the weaker party's claims are subject to arbitration, and there is no reasonable justification for that lack of symmetry, the agreement lacks the requisite degree of mutuality." (*Abramson v. Juniper Networks, Inc.* (2004) 115 Cal.App.4th 638, 657.) Capital has provided no business justification for the lack of mutuality in the arbitration agreement, and thus the term is substantively unconscionable.

Accordingly, the arbitration agreement is unconscionable.

D

*The Unconscionable Provisions Cannot Be Severed*

Capital argues, that even if certain provisions were unconscionable, the unconscionable provisions should have been severed from the arbitration agreement. We disagree.

" 'In deciding whether to sever terms rather than to preclude enforcement of the provision altogether, the overarching inquiry is whether the interests of justice would be furthered by severance; the strong preference is to sever unless the agreement is "permeated" by unconscionability.' [Citation.]

" 'An agreement to arbitrate is considered "permeated" by unconscionability where it contains more than one unconscionable provision. [Citation.] "Such multiple defects indicate a systematic effort to impose arbitration on [the nondrafting party] not simply as an alternative to litigation, but as an inferior forum that works to the [drafting party's] advantage." [Citation.] An arbitration agreement is also deemed "permeated" by unconscionability if "there is no single provision a court can strike or restrict in order to remove the unconscionable taint from the agreement." [Citation.] If "the court would have to, in effect, reform the contract, not through severance or restriction, but by augmenting it with additional terms," the court must void the entire agreement.' "

21

(*Bakersfield College v. California Community College Athletic Assn.*, *supra*, 41 Cal.App.5th at pp. 769-770, italics omitted.)

As discussed, the arbitration agreement contains several serious defects—most significantly the disparity in bargaining power and the lack of mutuality.  The procedural unconscionability coupled with the substantive unconscionability renders the arbitration agreement so " 'permeated' by unconscionability [it] could only be saved, if at all, by a reformation beyond our authority."  (*Mercuro v. Superior Court* (2002) 96 Cal.App.4th 167, 182.)  The arbitration agreement is therefore unenforceable.

DISPOSITION

The trial court's order is affirmed.  Capital shall pay costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)


  /s/_____
  Robie, P. J.



We concur:


  /s/_____
Duarte, J.


  /s/_____
Earl, J.